*Court Of Appeals*
*Fourth Court of Appeals District of Texas*
*San Antonio*

★ ★ ★ ★ ★ ★

# MEMORANDUM OPINION

No. 04-07-00778-CV

**TEXAS INDEPENDENT EXPLORATION, LTD.**,
Appellant

v.

**PEOPLES ENERGY PRODUCTION–TEXAS L.P.**
n/k/a Coronado Energy E&P Company, L.L.C.,
Appellee

From the 381st Judicial District Court, Starr County, Texas
Trial Court No. DC-03-385
Honorable Jose Luis Garza, Judge Presiding

Opinion by:     Steven C. Hilbig, Justice

Sitting:        Sandee Bryan Marion, Justice
                Steven C. Hilbig, Justice
                Marialyn Barnard, Justice

Delivered and Filed:   August 31, 2009

AFFIRMED

Peoples Energy Production–Texas L.P. n/k/a Coronado Energy E&P Company, L.L.C.

("Peoples Energy") sued Texas Independent Exploration, Ltd. ("Texas Independent") for declaratory

judgment seeking a favorable construction of an assignment in an oil and gas lease.  Texas

Independent counterclaimed seeking its own declaratory judgment.  Both parties moved for summary

judgment based on their interpretations of the assignment.  The trial court granted Peoples Energy's

motion and denied Texas Independent's motion. On appeal, Texas Independent contends the trial court erred in granting Peoples Energy's motion and denying its motion, arguing the trial court misconstrued the assignment. We affirm the trial court's judgment.

## BACKGROUND

In 1937, the First National Bank of Mission conveyed a 346.67 acre lease ("the Lease") to Tom Vessels Jr. Vessels later assigned the entire Lease to Sun Oil Company. By 1995, Union Pacific Oil & Gas Company owned an 80-acre portion of the Lease, which became known as the Farmout Lease. In 1995, Union Pacific assigned the Farmout Lease to Texas Independent pursuant to a document entitled "Farmout Agreement."[1] Texas Independent's interest was limited to the "Farmout Land," which was defined in section 1.12 of the Farmout Agreement as:

> . . . those depths below 6,600 feet below the surface and one hundred feet (100')
> below the total depth drilled in the Earning Well . . . but excepts depths below eight
> thousand two hundred and forty four (8,244') feet TVD.

Texas Independent, therefore, was permitted to drill only below 6,660' and above 8,224' ("the interval").

The Farmout Agreement also contained an option agreement, section 1.10.A, that required Texas Independent to offer Union Pacific, at cost, up to forty percent (40%) of any interest Texas Independent might subsequently acquire in any portion of the Lease, proportionately reduced to Union Pacific's current working interest. (1CR69):

> Should Farmee [Texas Independent] purchase any royalty, overriding royalty, net
> profit or production payment covering any portion of the First Bank of Mission lease,

---

[1] A "farmout agreement" is an assignment by a lease owner of all or part of the lease to another operator who wants to drill on the lease. *Mengden v. Peninsula Prod. Co.*, 544 S.W.2d 643, 645 n.1 (Tex. 1976); *ExxonMobil Corp. v. Valence Operating Co.*, 174 S.W.3d 303, 313 (Tex. App.—Houston [1st Dist.] 2005, pet. denied). The primary characteristic of a farmout agreement is the assignee's obligation to drill one or more wells on the assigned land as a prerequisite to the completion of the transfer. *Id.*

whether or not part of the Farmout lease . . . then Farmee shall offer to Farmor [Union Pacific] the opportunity to purchase, at cost, up to 40.0% of the acquired interest, proportionately reduced to Farmor's current working interest.

Texas Independent subsequently learned Sun Oil had a reserved interest in the Lease, a 12.5% overriding royalty interest[2] in all the oil, gas, and hydrocarbons produced from all depths on the entire 346.67-acre Lease ("the Sun ORRI"). On July 20, 1995, Texas Independent purchased the Sun ORRI for $100,000. In accordance with section 1.10.A of the Farmout Agreement, Texas Independent offered Union Pacific the opportunity to purchase forty percent of the Sun ORRI, proportionately reduced to its current working interest. Union Pacific accepted. It is undisputed that at the time of the offer, Union Pacific held a "current working interest" of 39.543%. Accordingly, Union Pacific purchased a 1.97715% share of the Sun ORRI (40% x 12.5% x 39.543%), resulting in a purchase price of $15,817.20.

Because Union Pacific never paid Texas Independent for the portion of the Sun ORRI it purchased, Texas Independent did not immediately execute the assignment. However, Texas Independent treated Union Pacific's interest as if it had been assigned by crediting payments to reduce Union Pacific's unpaid share of the purchase price. Despite the absence of a written assignment at the time of the offer and acceptance, Union Pacific conveyed its interest in the Sun ORRI to Sierra by "Assignment, Bill of Conveyance" dated November 15, 1996, and by "Correction Assignment, Bill of Sale and Conveyance" dated March 20, 1997, and effective July 1, 1996. By the time Texas Independent had received full payment from Union Pacific by deducting money from payments due Union Pacific pursuant to its interest in the Sun ORRI, Union Pacific had already

---

[2] An "overriding royalty interest" is a non-participating interest in an oil and gas lease. *Ridge Oil Co. v. Guinn Invs., Inc.*, 148 S.W.3d 143, 155 (Tex. 2004). An owner of an overriding royalty "has no right and thus no ability to go onto the underlying property and drill or otherwise take action to perpetuate a lease." *Id*. Rather, such an owner is dependent on the lessee to preserve the lease. *Id*.

assigned its interest to Sierra. Accordingly, on May 7, 2000, Texas Independent executed an "Assignment of Overriding Royalty Interest" ("the Assignment") directly to Sierra. The Assignment is the primary document around which the current controversy is centered. Sierra subsequently assigned its interest in the Sun ORRI to Peoples Energy via an assignment and bill of sale executed on April 26, 2001.

From 1995 to 2000, Texas Independent completed a number of producing wells in the interval and paid the holder of the Sun ORRI – Union Pacific, Sierra, or Peoples Energy – the 1.97715% interest on all production. In 2001, production was obtained from wells drilled below the interval. For two years, Peoples Energy was paid the 1.97715% interest on this production as well, and Texas Independent executed division orders acknowledging this. However, in 2003, Texas Independent "discovered" Peoples Energy had been paid the 1.97715% interest from depths below the interval, and sent Peoples Energy a proposed "Amendment of Assignment of Overriding Royalty Interest," purporting to amend the Assignment between Texas Independent and Sierra by including the following restriction: "INSOFAR AND ONLY INSOFAR as to all such production produced from the subsurface depths of 6, 600 feet to 8, 224 feet." In a letter enclosed with the proposed amendment, Texas Independent claimed that when it sold the Sun ORRI to Union Pacific, the sale included only an interest in minerals produced in the interval, and Peoples Energy had been "overpaid" when it received payment from production from wells below the interval. Texas Independent requested a retroactive redistribution of payment. Peoples Energy declined.

In October 2003, Peoples Energy filed a declaratory judgment action seeking a declaration that it owned the 1.97715% interest in the Sun ORRI as to all production under the Lease without any regard to a depth restriction. Texas Independent counterclaimed and then filed partial traditional

and no evidence motions for summary judgment seeking a declaration that Peoples Energy's interest in the Sun ORRI was limited to the interval, Texas Independent owns the Sun ORRI below the interval, and Texas Independent is entitled to recover monies wrongfully paid to Peoples Energy from production below the interval. Peoples Energy filed a cross-motion for summary judgment, arguing that as a matter of law the Assignment was unambiguous and gave Peoples Energy a 1.97715% interest in the Sun ORRI to all depths, and the statute of fraud precluded the Texas Independent's interpretation of the assignment. The trial court granted Peoples Energy's motion for summary judgment and denied those filed by Texas Independent. Texas Independent perfected this appeal.

### STANDARD OF REVIEW

A no evidence motion for summary judgment should be granted if the non-movant fails to present more than a scintilla of probative evidence to raise a genuine issue of material fact on the challenged element. *Timpte Indus. v. Gish*, 286 S.W.3d 306, 310 (Tex. 2009); *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004). A traditional motion for summary judgment is granted only when the movant establishes there are no genuine issues of material fact and it is entitled to judgment as a matter of law. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, No. 07-0490, 2009 WL 1028051, at *3 (Tex. Apr. 17, 2009). An appellate court reviews the grant or denial of a motion for summary judgment *de novo*. *Id.*; *Texas Mun. Power Agency v. Pub. Util. Comm'n of Texas*, 253 S.W.3d 184, 192 (Tex. 2007). The denial of a motion for summary judgment is generally not appealable, but can be reviewed on appeal when both parties moved for summary judgment and the trial court granted one motion and denied the other. *Id*. In such cases the appellate court reviews each summary judgment, determines all questions presented, and renders the judgment the trial court

should have rendered. *Id*. When the trial court's order does not specify the grounds for summary judgment, the appellate court must affirm the summary judgment if any of the theories presented to the trial court and preserved for appellate review are meritorious. *Provident Life and Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 216 (Tex. 2003).

Interpretation or construction of an unambiguous contract is a matter of law to be determined by the court. *Coats v. Farmers Ins. Exch.*, 230 S.W.3d 215, 217 (Tex. App.—Houston [14th Dist.] 2006, no pet.). When the controversy can be resolved by proper construction of an unambiguous contract, summary judgment is appropriate. *Id*.; *see also Hackberry Creek Country Club, Inc. v. Hackberry Creek Home Owners Ass'n*, 205 S.W.3d 46, 56 (Tex. App.—Dallas 2006, pet. denied) (citing *Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 529 (Tex. 1987)). However, if the contract is ambiguous, summary judgment is improper because the intent of the parties is a fact issue. *Hackberry Creek*, 205 S.W.3d at 56 (citing *Coker v. Coker*, 650 S.W.2d 391, 394 (Tex. 1983; *Harris v. Rowe*, 593 S.W.2d 303, 306 (Tex. 1979)).

## ANALYSIS

In construing a written contract, we must ascertain and give effect to the parties' intentions as expressed in the four corners of the document. *Frost Nat'l Bank v. L & F Distribs., Ltd.,* 165 S.W.3d 310, 311-12 (Tex. 2005) (per curiam). We consider the entire writing and attempt to harmonize and give effect to all the provisions of the contract by analyzing the provisions with reference to the whole agreement. *Id*. at 312. "No single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument." *J.M. Davidson, Inc. v. Webster,* 128 S.W.3d 223, 229 (Tex. 2003). If after the pertinent

rules of construction are applied, a contract can be given a definite or certain legal meaning, it is unambiguous, and is construed as a matter of law. *Frost Nat'l Bank,* 165 S.W.3d at 312.

Texas Independent and Peoples Energy agree, as do we, that the Assignment is unambiguous. Accordingly, we will construe it as a matter of law and render the summary judgment the trial court should have rendered. *See id.* Texas Independent contends the Assignment gave Sierra, and therefore Peoples Energy, a 1.97715% interest in the Sun ORRI, but only from production in the interval. Peoples contends the Assignment was not restricted to the interval, claiming instead the Assignment gave Sierra a 1.99715% interest in all production under the entire Lease without any depth restriction.

Pursuant to the Assignment, Texas Independent assigned Sierra a 1.97715% overriding royalty interest in "100% of all the oil, gas, and other hydrocarbons produced under" the entire 346.67-acre Lease. This is an extremely broad and seemingly unambiguous granting clause. Because a deed passes the greatest estate possible unless there are clear and unequivocal exceptions or reservations, the Assignment would appear to convey to Sierra an interest in the Sun ORRI without any depth restriction. *See Templeton v. Dreiss*, 961 S.W.2d 645, 657 (Tex. App.—San Antonio 1998, pet. denied) (holding deed will be construed to confer upon grantee greatest estate that terms of instrument will permit). This interpretation is supported by the fact that neither the original 346.67-acre Lease from First National Bank of Mission to Vessels nor the 80-acre Farmout Lease acquired by Union Pacific contained a depth restriction relating to the Sun ORRI. Rather, the 6,600'-8,244' depth restriction applied only to Texas Independent under the Farmout Agreement for the Farmout Lease (the 80-acre lease from Union Pacific to Texas Independent).

Relying in part on *Eland Energy, Inc. v. Rowden Oil & Gas, Inc.*, 914 S.W.2d 179 (Tex. App.—San Antonio 1995, writ denied), Texas Independent contends the Assignment contains a depth restriction because the "subject to" clause in the Assignment references the Farmout Agreement, and when the documents are read together the interest in the Sun ORRI is limited to the interval. The "subject to" clause in the Assignment states, in pertinent part:

> The interest herein conveyed to Assignee is subject to the terms and provisions contained in the Lease and all prior contracts pertaining thereto, including but not limited to, the following:
>
> > 1. That certain Farmout Agreement dated April 22, 1995, between Union Pacific Oil and Gas Company, et al[.], as Farmors and Texas Independent Exploration, Inc., as Farmee.

The Assignment is also made "subject to" the assignment of the Sun ORRI to Texas Independent, and the assignment of Union Pacific's proportionate share in the Sun ORRI to Sierra.

Texas Independent argues section 1.10A of the Farmout Agreement, to which the Assignment is subject, limits Peoples Energy's interest in the Sun ORRI to the "current working interest" held by Union Pacific, which Texas Independent claims was limited to 1.97715% in the 6,600'-8,224' interval. Texas Independent contends that to interpret the Assignment in any other way ignores the "subject to" language, which applied section 1.10A of the Farmout Agreement to the Assignment. According to Texas Independent, but for section 1.10A, neither Union Pacific nor its successors in interest would have had any right to the Sun ORRI, and therefore by inserting the "subject to" language in the Assignment, the parties inserted the "proportionate reduction" and "current working interest" limitations into the Assignment.

Countering Texas Independent's argument, Peoples Energy contends reversal is not warranted because: (1) Texas Independent incorrectly concludes the "subject to' clause has only one

possible construction, (2) Texas Independent's reliance on this court's opinion in *Eland* is misplaced, (3) none of the following provides for a relevant depth restriction – section 1.10A of the Farmout Agreement, the term "working interest," or the Sun ORRI chain of title, and (4) Texas Independent's interpretation of the Assignment conflicts with general rules of contract construction. Peoples Energy concludes the trial court correctly granted its motion for summary judgment because a proper interpretation of the Assignment establishes it conveyed to Sierra a 1.97715% interest, i.e., the "current working interest," to the minerals under the 346.67-acre Lease without regard to depth.

### Construction of "Subject To" Clause

Texas Independent contends the trial court erred in granting summary judgment in favor of Peoples Energy because to do so required the court to ignore the "subject to" clause, thereby rendering it meaningless in violation of the rules of construction. *See J.M. Davidson,* 128 S.W.3d at 229 (holding that in ascertaining true intent of parties as expressed in instrument, court must consider entire writing in effort to harmonize and give effect to all provisions so that none will be rendered meaningless). We disagree.

The phrase "subject to" is a limitation of a grant, defining the nature, extent, and character of the estate conveyed. *Cockrell v. Tex. Gulf Sulphur Co.*, 157 Tex. 10, 16, 299 S.W.2d 672, 676 (1956); *Petro Pro, Ltd. v. Upland Res., Inc.*, 279 S.W.3d 743, 750 (Tex. App.—Amarillo 2007, pets. denied). "It neither conveys an interest to the assignee, nor does it reserve or retain an interest in favor of the assignor." *Petro Pro*, 279 S.W.3d at 750; *see Wright v. E.P. Operating Ltd. P'ship*, 978 S.W.2d 684, 688 (Tex. App.—Eastland 1998, pet. denied) (holding conveyance made no reservation even where it was "subject to" prior recorded reservation). Rather, it simply limits the extent of the interest granted. *Petro Pro*, 279 S.W.3d at 750. As such, it "is a term of qualification and not of

contract[,]" and "[t]here is nothing in the use of the words 'subject to,' in their ordinary use, which would even hint at the creation of affirmative rights." *Kokernot v. Caldwell*, 231 S.W.2d 528, 531 (Tex. Civ. App.—Dallas 1950, writ ref'd). The principal function of a "subject to" clause is to protect a grantor against a breach of warranty claim. *Walker v. Foss*, 930 S.W.2d 701, 706 (Tex. App.—San Antonio 1996, no writ). Conveying land "subject to" defined interests is merely a means of providing notice of outstanding interests that may affect a grantee's title. *PYR Energy Corp v. Samson Res. Co.*, 470 F.Supp.2d 709, 717 (E.D. Tex. 2007) (citing *Wright*, 978 S.W.2d at 688).

Here, the summary judgment evidence establishes Texas Independent offered and sold the interest in the Sun ORRI to Union Pacific by way of letters that never mentioned a depth restriction. Texas Independent subsequently assigned the Sun ORRI to Sierra without mentioning a depth restriction. Sierra did not participate in the previous transaction between Union Pacific and Texas Independent, and Texas Independent had nothing to do with the transaction between Union Pacific and Sierra. Therefore, in interpreting the Assignment and its "subject to" clause, the trial court, considering the facts and circumstances surrounding the execution of the Assignment[3], could have concluded the clause was intended merely to (1) document the chain of title, (2) insulate Texas Independent from claims by Union Pacific (or its successors) that Texas Independent had wrongfully assigned the deed to Sierra, and/or (3) insulate Texas Independent from claims of breach of warranty by Sierra. *See Wright*, 978 S.W.2d at 688; *Walker*, 930 S.W.2d at 706. Moreover, the trial court could have concluded the "subject to" clause did not impose the depth restriction applicable to the Farmout Land, i.e., the 80 acres assigned by Union Pacific to Texas Independent under the Farmout Agreement, on other portions of the 346.67-acre Lease. Finally, the trial court knew the "subject to"

---

[3] *See EOG Res., Inc. v. Killam Oil Co*., 239 S.W.3d 293, 298 (Tex. App.—San Antonio 2007, pet. denied) (holding court may consider facts and circumstances surrounding execution of contract as construction aid).

clause could not be used to describe the land to which the Sun ORRI applied nor to restrict it, and thus the parties must have intended it to have another meaning. *See Averyt v. Grande Inc.*, 717 S.W.2d 891, 894-95 (Tex. 1986) (holding "subject to" clause does not limit land description).

Accordingly, given that the meanings and effects of "subject to" clauses can vary given the particular circumstances, Texas Independent's contention that the trial court necessarily ignored the "subject to" clause when it granted summary judgment in favor of Peoples Energy is incorrect.

### *Eland Energy, Inc. v. Rowden Oil & Gas, Inc.*

Texas Independent also contends the trial court erred in granting summary judgment in favor of Peoples Energy because it failed to follow this court's decision in *Eland*. According to Texas Independent, *Eland* is directly on point and mandates that we interpret the "subject to" clause to limit Peoples Energy's interest in the Sun ORRI to the interval. We have carefully reviewed *Eland* and must again disagree with Texas Independent.

First, *Eland* is not a contract construction case. *See* 914 S.W.2d at 184-88. Rather, it deals with issues relating to limitations, statute of frauds, laches, estoppel, and a non-assignability clause. *Id.* Second, regarding the "subject to" clause, our discussion in *Eland* revolved around Eland Energy's limitations claim, and we merely held the clause could not "be ignored" and it had to "be assumed that the parties intended that it have meaning." *Id*. at 185. We agree with our statements in *Eland*, but its holding does not mandate the interpretation of the "subject to" clause proposed by Texas Independent.

In *Eland*, the parties executed a farmout agreement covering what was known as the Perez Lease. *Id*. at 182. Under the agreement, the farmor agreed to assign the farmee "40 acres in the form of a square as nearly as possible" around each producing well completed by the farmee. *Id*. After

the farmee completed the first well under the agreement, he suggested to the farmor that it would be easier if the farmor assigned the entire Perez Lease to the farmee. *Id.* If the farmee failed to develop any portion of the lease, he would later assign these portions back to the farmor. *Id.* This conditional assignment stated it was "subject to" the terms and provisions of the farmout agreement, which included a continuous drilling obligation and provided the manner in which ownership could be acquired. *Id.* Subsequently, Eland Energy, a successor-in-interest to the farmee, attempted to escape the reassignment provision, refusing to reassign the undeveloped portions of the lease back to the farmor after drilling ceased. *Id.* at 183. When Eland Energy refused to reassign the undeveloped land as required by the farmout agreement, the farmor and numerous successors-in-interest to the farmee filed suit to clear title, arguing that pursuant to the farmout agreement and the conditional assignment, Eland Energy was required to reassign the undeveloped portions of the lease back to the farmor. *Id.* Eland Energy claimed it did not have to reassign the land to the farmor and was entitled ownership of the undeveloped portions of the lease because, among other things, the farmor's suit sought specific performance to convey real property and was barred by limitations. *Id.* The trial court found in favor of the farmor and the successors-in-interest, and this court affirmed the judgment. *Id.* at 181, 184.

In affirming the trial court's judgment, this court rejected Eland Energy's statute of limitations claim. In our analysis, we noted the "subject to" clause of the conditional assignment was at the "crux" of Eland Energy's limitations claim. *Id.* at 185. We then held the farmout agreement and the conditional assignment had to be read together or the "subject to" clause would be rendered meaningless. *Id.* We further held the clause could have but one meaning –that despite the assignment of the entire Perez Lease to the farmee, the farmee could only acquire equitable title in

the lease by earning it pursuant to the farmout agreement, i.e., by drilling producing wells. *Id.* Because Eland Energy did not produce wells on the property at issue, it did not acquire any equitable interest in that property. Accordingly, the farmor's claim could not be characterized as a specific performance action to convey real property, Eland Energy had nothing to convey, and the four-year statute of limitation did not apply. *Id.* at 186.

Our holding in *Eland* requires only that a "subject to" clause not be ignored or rendered meaningless. There is no evidence the trial court ignored the clause simply because it failed to accept Texas Independent's interpretation of it.

This case and *Eland* share commonalities only with regard to the documents involved: a mineral lease, a farmout agreement, and an assignment that is "subject to" the farmout agreement. In all other respects the cases are drastically different:

> •*Eland* involved a conditional assignment of a lease made to modify the mechanics of a farmout agreement. The present case involved an unconditional assignment of an ORRI in "100% of the oil, gas and other hydrocarbons" under a lease in order to satisfy an option agreement that happened to be contained in a farmout agreement.

> •*Eland* concerned a conveyance of bare legal title and reservation of equitable title. Here, there was no dispute that full title passed.

> •It was undisputed in *Eland* that the original contracting parties intended to reassign the undeveloped tracts back to the farmor. In the present case Texas Independent disputed the intent evidenced in the Assignment to convey the Sun ORRI with no depth restriction.

> •Most importantly, the farmout agreement in *Eland* involved the same interest in land as the assignment made subject to it. In contrast, the Farmout Agreement involved the 80-acre Farmout Lease, while the Assignment involved the Sun ORRI, which covered the entire 346.67-acre Lease. Unlike *Eland*, even when the Farmout Agreement and the Assignment are read together, it does not necessitate a finding of a depth restriction related to the Sun ORRI. The depth restriction related only to the Farmout Agreement between Texas Independent and Union Pacific, and limited *Texas Independent's* interest to the interval. No such limitation is applicable to the Sun ORRI.

Accordingly, our holding in *Eland* does not mandate a finding that the "subject to" clause's reference to the Farmout Agreement and other assignments inserted a depth with regard to the Sun ORRI.

### *Section 1.10A of the Farmout Agreement*

Texas Independent places a great deal of reliance on section 1.10A of the Farmout Agreement to challenge the summary judgment in favor of Peoples Energy. As noted above, section 1.10A provides that if Texas Independent purchased any royalty or overriding royalty interest in any portion of the 346.67-acre Lease (not just the 80-acre lease assigned to it by Union Pacific), Union Pacific had an option to purchase up to forty percent of the purchased interest, proportionally reduced to its current working interest. (2CR541) Texas Independent claims this is the source of the depth restriction to which the Sun ORRI is subject. Texas Independent's reliance is misplaced for two reasons: (1) section 1.10A is nothing more than an option agreement, and (2) Texas Independent's interpretation of section 1.10A would render meaningless the part of section 1.10A that gives Union Pacific the option to purchase any interest Texas Independent might purchase on "*any portion*" of the 346.67-acre Lease.

Section 1.10A is merely an option contract that happens to be in a farmout agreement. *See Probus Props. v. Kirby*, 200 S.W.3d 258, 261 (Tex. App.—Dallas 2006, pet. denied) (stating that in option to purchase property, optioner offers to sell property on stated terms for specific period of time, and optionee has right to accept or decline); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 25 (1981) (stating option contract is promise meeting requirement for formation of contract, but that limits promisor's power to revoke offer). Section 1.10A's only function, based on its unambiguous language, is to obligate Texas Independent to offer a part of any interest it might purchase in the Lease to Union Pacific for purchase. Once the option was exercised, it no longer

existed, unless and until Texas Independent purchased some other interest in the lease. Rather, a binding, bilateral contract was formed and the previous relationship of Texas Independent as optioner and Union Pacific as optionee ceased, and a new relationship of grantor and grantee arose, requiring Texas Independent to execute an instrument to convey the interest purchased to Union Pacific. *See, e.g., Pitman v. Sanditen*, 626 S.W.2d 496, 498 (Tex. 1981); *Luccia v. Ross*, 274 S.W.3d 140, 148-49 (Tex. App.—Houston [1st Dist.] 2008, pet. denied). Once the conveying instrument was executed, in this case the Assignment, all prior transactions between Texas Independent and Union Pacific and its successors-in-interest to the Sun ORRI were merged into the Assignment, and all of the parties' rights rested solely in the Assignment. *See Alvarado v. Bolton*, 749 S.W.2d 47, 48 (Tex. 1988) (holding that where deed is delivered and accepted as performance of contract to convey, contract merges into deed and deed alone determine parties' rights); *GXG, Inc. v. Texacal Oil & Gas*, 977 S.W.3d 403, 415 (Tex. App.—Corpus Christi 1998, pet. denied) (holding doctrine of "merger by deed" operates to merge all prior transactions between parties into deed).

Here, as a mere option contract, once the Assignment was executed, the parties' rights in the Sun ORRI was controlled by the Assignment, and no longer had a separate effect. Accordingly, Section 1.10A cannot supply the depth restriction claimed by Texas Independent.

Additionally, if we were to accept Texas Independent's interpretation that section 1.10A provided a depth restriction with regard to the Assignment of the Sun ORRI, it would render another portion of section 1.10A meaningless and limit Union Pacific's rights under the Farmout Agreement. Section 1.10A gave Union Pacific an option to purchase if Texas Independent purchases "any portion" of the 346.67-acre Lease. It is undisputed that but for the depth restriction placed on Texas Independent with regard to the Farmout Land (the 80-acre lease from Union Pacific to Texas

Independent), there is no depth restriction on the other portions of the Lease. If section 1.10A limits the optionee to only the interval, the option to purchase royalties obtained by the optioner on "any portion" of the Lease is rendered meaningless. Such an interpretation would be contrary to the rules of construction. *See J.M. Davidson*, 128 S.W.3d at 229 (holding that in ascertaining true intent of parties as expressed in instrument, court must consider entire writing in effort to harmonize and give effect to all provisions so that none will be rendered meaningless).

### *"Working Interest"*

We also reject Texas Independent's argument that the use of the term "working interest" in section 1.10A imposed a depth restriction on the Sun ORRI obtained by Union Pacific. Texas Independent attempts to ascribe a meaning to "working interest" that conflicts with definitions espoused by other courts, as well as the parties' use of it in this case.

"[A] working interest is generally understood to mean a mineral interest created by a leasehold." *Broesche v. Jacobson*, 218 S.W.3d 267, 272 (Tex. App.—Houston [14th Dist.] 2007, pet. denied); *see also Geodyne Energy Income Prod. P'ship I-E v. Newton Corp.*, 161 S.W.3d 482, 486 n.10 (Tex. 2005) (describing "gross working interest" as "percentage share of all expenses and revenues . . . plus any royalties attributable to the working interest."). It may also be used to denote an interest in mineral rights. *Broesche*, 218 S.W.3d at 273. Texas Independent cites no authority for the proposition that the use of the term "working interest" in section 1.10A supplied a depth restriction to the royalty interest purchased by Union Pacific.

Moreover, the summary judgment evidence reflects the parties in this case used "working interest" to refer to a percentage of ownership. In section 4.3.5 of the Farmout Agreement, the parties agreed that if the Farmout Lease covered less than the entire mineral estate described therein,

or if Union Pacific's "working interest" was less than one hundred percent, then any retained or reversionary interest of Union Pacific would be proportionately reduced. "Working interest" was clearly used to refer to Union Pacific's percentage of ownership. Additionally, when Texas Independent offered Union Pacific the Sun ORRI, as required by section 1.10A, Texas Independent described Union Pacific's working interest as 39.543%, not as a depth restriction. Also, the Assignment conveys a 1.97715% interest in the Sun ORRI, and this percentage could only have been calculated using the working interest as a percentage of ownership: 12.5% (the Sun ORRI purchased by Texas Independent) multiplied by 40% (the percentage of interest Union Pacific was entitled to purchase) multiplied by 39.543% (Union Pacific's working interest). Texas Independent used this exact calculation in its offer letters to determine Union Pacific's pro rata share of the purchase price, confirming the parties use of "working" interest as a percentage of ownership, not a depth restriction.

If Texas Independent is correct that "working interest" connotes a depth restriction, the calculation set forth above would be different. Texas Independent paid $100,000 for a 12.5% overriding royalty interest in all the mineral produced from all depths in the entire 346.67-acre Lease. When Texas Independent offered the Sun ORRI to Union Pacific as required, it did not apportion the purchase price to account for a depth restriction. As Peoples Energy points out, if Union Pacific purchased the Sun ORRI with a depth restriction, the purchase price should have been reduced; however, Texas Independent sought payment based on the $100,000 it paid for the non-restricted interest.

Finally, the summary judgment record includes a division order, dated 2001, which was after Texas Independent executed the Assignment and two wells had been drilled to more than 8,244'. If Texas Independent's interpretation of working interest were correct, the 2001 division order would

show Texas Independent as the owner of a 12.5 overriding royalty interest in the two wells drilled below 8,224'. However, the division order reflects Texas Independent owns a 10.522850% overriding royalty interest (the original 12.5% purchased from Sun less the 1.97715% purchased by Union Pacific and later assigned to Sierra). (2CR608) Texas Independent confirmed this division order and signed it, signaling its recognition that "working interest" mean percentage of ownership unrelated to depth.

Accordingly, Texas Independent's attempt to impose a depth restriction through the term "working interest" is an improper interpretation of the term according to the law as well as the summary judgment evidence.

### *Rules of Construction*

In addition to violating basic rules of construction by rendering meaningless a portion of section 1.10A as discussed above, Texas Independent's interpretation of the Assignment – the "subject to" clause, section 1.10A, and the term "working interest" – violates the rule of construction that grants are to be liberally construed in favor of the grantee, and exceptions strictly construed against the grantor. *Baker v. Henderson*, 137 Tex. 266, 276, 153 S.W.2d 465, 470 (1941); *Chambers v. Huggins*, 709 S.W.2d 219, 221 (Tex. App.—Houston [14th Dist.] 1986, no writ). It also ignores the basic rule that reservations and exceptions in grants must be clear and specific; courts do not favor reservations by implication. *Sharp v. Fowler*, 151 Tex. 490, 494, 252 S.W.2d 153, 154 (1952); *Derwen Res., LLC v. Carrizo Oil & Gas, Inc.*, No. 09-07-00597-CV, 2008 WL 6141597, at *6 (Tex. App.—Beaumont May 21, 2009, pet. filed) (mem. op.). To properly make a reservation or exception, it should be mentioned in the granting clause and fully set out thereafter. *Derwen*, 2008 WL 6141597, at *6 (citing 55 TEX. JUR.3D *Oil and Gas* § 65 (2004)). Here, Texas Independent was

clearly capable of limiting Union Pacific's interest in the Sun ORRI to the 6,600'-8,224' interval if that had been its intention. Depth restrictions are not novel in the oil and gas industry. Finally, to adopt Texas Independent's interpretation would be to allow Texas Independent's current, subjective intent to control over the intent as expressed in the Assignment, which is impermissible. *See Frost Nat'l Bank*, 165 S.W.3d at 311-12 (in construing a written contract courts must give effect to intent as expressed in four corners of document).

## CONCLUSION

We hold the Assignment, even when considered with the Farmout Agreement, is capable of but one interpretation: that Union Pacific, pursuant to section 1.10A, purchased a percentage of the Sun ORRI, proportionately reduced, without regard to depth. Texas Independent's attempt to transfer the depth restriction imposed on it under the Farmout Agreement to the subsequent Sun ORRI by way of the "subject to" clause, section 1.10A, or the term "working interest" is incongruous. The only depth restriction in this case arose in the Farmout Agreement between Union Pacific and Texas Independent. That depth restriction limited Texas Independent's interest in the Farmout Land to the 6,600'-8,224' interval. The Sun ORRI, on the other hand, entitled its owner to an overriding royalty interest in all the minerals produced from all depths in the entire Lease. Accordingly, we overrule Texas Independent's issues and affirm the trial court's judgment.[4]

Steven C. Hilbig, Justice

---

[4] Given our disposition, we need not address Peoples Energy's alternate contention that the statute of fraud precludes Texas Independent's interpretation of the Assignment.