

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

_____

No. 07-11-00403-CV
_____

CHESAPEAKE OPERATING, INC., NOMAC DRILLING CORPORATION,
ROBERT RUSSELL/ROBERT M. CONSULTING, LLC, APPELLANTS

V.

KEVIN PAUL HOPEL, APPELLEE

On Appeal from the 18th District Court
Johnson County, Texas
Trial Court No. C2009-00303; Honorable John E. Neill, Presiding

October 24, 2013

## MEMORANDUM OPINION

Before QUINN, C.J., and CAMPBELL and PIRTLE, JJ.

This appeal presents the question of whether expert testimony based upon speculative assumptions is sufficient to support an award of future loss of earning capacity and the dilemma of determining whether such assumptions are reasonable just because "an expert says it is so." *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d

706, 712 (Tex. 1997), *cert. denied*, 523 U.S. 1119, 118 S.Ct. 1799, 140 L.Ed.2d 939 (1998) (citing *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 421 (5th Cir. 1987)).

Presenting two issues, Appellants, Chesapeake Operating, Inc., Nomac Drilling Corporation and Robert Russell/Robert M. Consulting LLC, challenge an award of damages to Appellee, Kevin Paul Hopel, in his personal injury suit against them. Appellants maintain by their first issue that the trial court erred in awarding past and future lost earning capacity damages based on inadmissible expert testimony. By issue two, they allege the trial court committed reversible error when it allowed Appellee to introduce irrelevant evidence of unadjusted "gross medical bills" in direct contradiction of section 41.0105 of the Texas Civil Practice and Remedies Code and *Haygood v. De Escabedo*, 356 S.W.3d 390, 399 (Tex. 2011), which limits such evidence to medical bills actually paid or incurred. We sustain issue one, pretermit issue two, reverse the judgment of the trial court and, in the interests of justice, remand for further proceedings. *See* TEX. R. APP. P. 43.3(b).

## BACKGROUND

Chesapeake Operating, Inc. contracted with Crescent Directional Drilling to provide directional drilling services on a well being drilled by Nomac Drilling Corporation in Johnson County. Robert Russell/Robert M. Consulting, Inc., was a third party contractor who supervised the well site. Appellee was hired by Crescent as a Measure-While-Drilling (MWD) trainee. According to Appellee, in April of 2007, he was hired as a trainee for four to five months before becoming an MWD engineer.

On December 19, 2007, after being on the job for approximately eight months, Appellee was instructed by his supervisor, Cameron Stevens, to assist him in carrying and placing a tool, approximately twenty-five to thirty feet long and weighing 250 to 300 pounds, on a metal catwalk. After they put down the tool, but while still on the catwalk, a Nomac derrickman operating a forklift struck a monel collar, a pipe weighing approximately 3,000 pounds, which slid towards a pipe stop that failed causing drill pipe to jump over the pipe stop and careen in Appellee and Stevens's direction. When they realized the drill pipe was careening in their direction, Appellee and Stevens ran in the opposite direction and jumped to the ground four feet below the catwalk to avoid being struck by the drill pipe. Appellee landed with his left leg in a straight position and felt it snap.[1]

Appellee suffered a severe fracture and was transported by ambulance to a hospital in Fort Worth where he underwent surgery. Dr. Owen C. DeWitt, an orthopedic surgeon, performed surgery for a tibia plateau fracture. After Appellee was discharged, he returned home to New Orleans to convalesce. In March 2008, while still experiencing pain and weakness in his knee, Appellee sought treatment from Dr. Terry Habig, another orthopedic surgeon. After months of therapy and some improvement, Appellee continued to have pain and Dr. Habig ordered an MRI. Test results showed a torn medial meniscus and a second surgery was performed in August 2008.

Several years after his accident, Appellee filed suit against Appellants alleging negligence and seeking monetary damages. Dr. Habig testified over objection that

---

[1]At the time of the accident, Appellee was thirty years old and had a wife and young son living in New Orleans.

Appellee's second surgery was related to his fall at work. He testified Appellee continued therapy for months and, in October 2008, concluded Appellee had reached maximum medical improvement. Dr. Habig recommended Appellee undergo a functional capacities evaluation to determine his limitations. In December 2008, Appellee was released to return to sedentary light duty work with weight lifting maximums.

Dr. DeWitt testified Appellee's disability rating was four to nine percent whole body and nine to twenty-two percent lower body. He also testified Appellee could no longer play golf, run, ski or enjoy sports with his son. Although Appellee had made significant progress with full weight bearing and showed increased muscular endurance, Dr. DeWitt testified that his light duty work restriction would keep him from working in the oil fields.

Appellee testified Crescent offered him a job in its New Orleans office suitable to his restrictions and he accepted it, but was later laid off in March 2009. For months, he filed applications with businesses to no avail and eventually began a courier service delivering various legal documents for lawyers and closing documents to title companies. He was only able to keep the business afloat for about six months and was ultimately unable to recoup his original investment. Eventually, with the help of a friend, in August 2010, he found employment suitable to his physical restrictions with Harvey Gulf International Marine, a tug boat company, at a starting salary of $85,000 plus benefits. Although grateful for the job, Appellee testified that sitting behind a desk was not what he had planned for the rest of his life.

Dr. Cornelius Gorman, a vocational rehabilitation counselor, and Dr. Roy Douglas Womack, an economist, both testified as experts for Appellee. After a jury trial and verdict in his favor, Appellee was awarded, among other damages, $170,000 for past loss of earning capacity and $480,000 for future loss of earning capacity. Post-verdict, the trial court reduced the award for past medical care expenses from $92,817.18 to $38,661.48.[2] The jury found Appellee thirty percent negligent which resulted in an award of $587,945.19.

By their first issue, Appellants challenge the trial court's admission of and refusal to limit the testimony of experts Gorman and Womack. They characterize portions of Gorman's opinion as speculative and unreliable with no factual basis other than Appellee's hope of being promoted to one of the top-paying positions in the oil field industry, that of a directional driller. We conclude the trial court erred in admitting that expert testimony.

## ISSUE ONE
### EXPERT TESTIMONY – RELEVANCE AND RELIABILITY

Rule 702 of the Texas Rules of Evidence provides that an expert may testify if scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue. The expert's opinion is, however, inadmissible if the trial court determines that the underlying facts or data do not provide a sufficient basis for the opinion. TEX. R. EVID. 705(c).

---

[2]This case was tried in March 2011, and *Haygood v. De Escabedo*, 356 S.W.3d 390 (Tex. 2011), was issued on July 11, 2011.

5

To be admissible, an expert's opinion must be both relevant and reliable. *See E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 556-58 (Tex. 1995). *See also Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The requirement that expert testimony be relevant incorporates traditional relevancy analysis under Rules 401 and 402 of the Texas Rules of Evidence, and in order to be relevant the proposed testimony must be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Robinson*, 923 S.W.2d at 556 (quoting *Daubert*, 113 S.Ct. at 2796). In addition, in order to be reliable the expert must explain how the facts of the case support his conclusion. *See Volkswagen of Am.*, *Inc. v. Ramirez*, 159 S.W.3d 897, 905-06 (Tex. 2004). Without a substantial basis in fact, an expert's bare opinion will not suffice. *Id.* Accordingly, an expert's opinion that is based on assumed facts that vary from the actual facts is "incompetent evidence," without probative value, and such conclusory testimony cannot support a judgment. *See Coastal Transp. Co. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 232 (Tex. 2004). *See also Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 500 (Tex. 1995).

Although the trial court serves as an evidentiary gatekeeper by screening out irrelevant and unreliable expert evidence, it still has broad discretion to determine the admissibility of evidence. *See Exxon Pipeline Co., v. Zwahr*, 88 S.W.3d 623, 629 (Tex. 2002). Accordingly, we review the trial court's decision to admit such testimony under an abuse of discretion standard. *Id.*

It is not the role of the trial court to determine the truth or falsity of an expert's opinion. *See Robinson*, 923 S.W.2d at 558. Rather, the trial court's role regarding expert testimony is to serve as an evidentiary gatekeeper, making the initial determination whether the expert's opinion is relevant and whether the methods and research upon which it is based are reliable. *Id.* The burden is on the proponent of the evidence to demonstrate the expert's opinion is both relevant and reliable. *Id.* at 557. If the expert's opinion is not relevant or reliable, it is not evidence.[4] *Havner*, 953 S.W.2d at 713. An expert witness may be very believable, but his conclusions may be based on irrelevant assumptions or unreliable methodology. *Robinson*, 923 S.W.2d at 558. Just because a person has a degree and is designated an "expert" doesn't mean he should be "allowed to testify that the world is flat, that the moon is made of green cheese, or that the Earth is the center of the solar system." *Id.*

A trial court must act as an evidentiary gatekeeper by screening out irrelevant and unreliable expert testimony. *Enbridge Pipelines (E. Tex.) L.P. v. Avinger Timber, LLC*, 386 S.W.3d 256, 262 (Tex. 2012). Abuse of discretion is the proper standard by which to review a trial court's decision to admit or exclude expert testimony. *See General Electric Co. v. Joiner*, 522 U.S. 136, 146, 139 L.Ed.2d 508, 118 S.Ct. 512

---

[3]Appellants complain in their first issue of the trial court's decision to admit Gorman's and Womack's expert opinions regarding Appellee's loss of earning capacity. They challenge the trial court's admission of "speculative and unreliable testimony about a hypothetical promotion to support Appellee's lost earning capacity awards" and rely on legal authorities pertinent to the admissibility of expert testimony. We disagree with Appellee's conclusion in his brief that Appellants "stepped away from any abuse of discretion analysis . . . by assigning no error" to the trial court's ruling.

[4]If the trial court concludes that the scintilla of evidence presented supporting a position is insufficient to allow a reasonable juror to conclude that the position more likely than not is true, the court remains free to direct a judgment . . . and likewise grant summary judgment. *Daubert*, 509 U.S. at 596.

(1997). *See also Cooper Tire & Rubber Co. v. Mendez*, 204 S.W.3d 797, 800 (Tex. 2006); *Zwahr*, 88 S.W.3d at 629. A trial court abuses its discretion if its decision is arbitrary and unreasonable without reference to any guiding rules or principles. *Robinson*, 923 S.W.2d at 558 (citing *Downer v. Aquamarine Operators, Inc.* 701 S.W.2d 238, 241-42 (Tex. 1985), *cert. denied*, 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986)).

## LOSS OF EARNING CAPACITY

The proper measure of damages for loss of earning capacity is a plaintiff's diminished ability to earn a living. *Big Bird Tree Serv. v. Gallegos*, 365 S.W.3d 173, 178 (Tex.App.—Dallas 2012, pet. denied); *Bituminous Cas. Corp. v. Cleveland*, 223 S.W.3d 485, 491 (Tex.App.—Amarillo 2006, no pet.). It entails consideration of what a plaintiff's capacity to earn a livelihood actually was and assesses the extent to which it has been impaired. *Cleveland*, 223 S.W.3d at 491. It is not measured by what a person actually earned before the injury. *See Pilgrim's Pride Corp. v. Cernat*, 205 S.W.3d 110, 120 (Tex.App.—Texarkana 2006, pet. denied). However, where a plaintiff seeks damages for loss of earning capacity in a particular field, the amount of earnings must be shown with reasonable certainty and be based on more than mere conjecture. *See McIver v. Gloria*, 140 Tex. 566, 169 S.W.2d 710, 712 (1943).

Loss of future earning capacity is a plaintiff's ability to earn a living after trial. *Id.* Because future earning capacity is always uncertain, the jury has considerable discretion in determining the amount. However, the award for loss of future earning

capacity must be supported by sufficient evidence to allow the jury to reasonably measure earning capacity in monetary terms. *Id.*

## ANALYSIS

Before Appellee's experts testified, the trial court conducted a *Daubert*[5] hearing to determine whether to limit the testimony of Gorman and Womack on Appellee's loss of earning capacity. Appellants argued that permitting Gorman to speculate on Appellee being promoted to lead MWD engineer and then being further promoted to the position of a directional driller at a salary of $200,000 per year was speculative. Appellee's counsel argued that the oil drilling industry was booming, jobs were plentiful, and with Appellee's experience, he would have been promoted to directional driller. After taking the motion under advisement, the trial court ruled that both Gorman and Womack would be permitted to testify without limitations and the jury could judge their credibility.

Before the jury, Appellee testified that as an MWD engineer, he was making $2,200 per month in salary, plus $200 per day if on a rig, $850 car allowance, .40 per mile travel, and $35 per diem. He estimated his annual compensation to be between $110,000 and $118,000 at the time of his injury. According to Appellee's testimony, an MWD lead engineer, depending on years of experience, could earn between $125,000 and $150,000, and a directional driller could earn approximately $200,000 per year. For the purpose of determining loss of past earning capacity, Appellee was injured on

---

[5] *Daubert*, 509 U.S. at 597.

December 19, 2007, and trial commenced on March 21, 2011, although he was not unemployed the entire time.

Gorman testified he met with Appellee to determine his literacy, intellect and prior work history. He also evaluated his medical records in preparation for his testimony. His methodology was to compare Appellee's characteristics and medical history to determine alternative employment. Gorman testified Appellee's limited education was irrelevant in the oil drilling industry. Gorman compared his findings with federal standards and statistics while drawing on his past experiences working with other oil companies. He determined Appellee would have difficulty with extended driving, sitting, standing and walking but that he was highly motivated and interested in oil exploration and drilling.

Gorman's prediction for Appellee in 2008 was that with successful vocational rehabilitation, he could earn $40,000 to $50,000 annually. He opined that but for the injury, Appellee "probably" would have become an MWD lead engineer or a directional driller based on his determination and work history, and because he met all federal criteria. When asked if Appellee "would have more likely than not been employed at the level of a lead hand or directional driller for the rest of his life," Gorman answered "yes." Gorman also testified that given his experience in the industry, Appellee "more probably than not" was in line for a promotion. Gorman further testified Appellee had six years of experience in the oil industry which is twice the time and training necessary for advancement. He also testified the oil industry was booming.

10

Womack, an economist, crunched the numbers given to him by Gorman in calculating Appellee's loss of past and future earning capacity. Womack testified he took the numbers provided to him and made calculations based on key assumptions. Using Appellee's pre-injury earning capacity and offsetting it with a post-injury earning capacity of $40,000 per year, Womack concluded Appellee's loss of future earning capacity would be $2,088,424 if employed at $125,000. On the high end of the pay scale of $200,000, Appellee's loss of future earning capacity would be $4,194,736.[6] Womack acknowledged his calculations would be inaccurate if his key assumptions based on Gorman's information were unreliable.

We believe Appellee's experience in oil drilling, as testified to by Gorman, was inaccurate and exaggerated. Appellee's work history showed he moved from job to job often and in varying industries. After obtaining his GED, Appellee worked in a feed store for one year and then became employed by Nowska where he serviced offshore equipment and worked as a coil tubing operator for one and one-half years. That company was bought out and the office he worked in was closed. He found employment with Superior Well Service and performed numerous tasks but was laid off after two years due to the economy. His next job was with Coca-Cola as a merchandiser. He testified his employment with Coca-Cola lasted two years. He then gained employment with a shortline railroad for about four and one-half years first as a switchman and then as an engineer. In 2005, after Hurricane Katrina hit the Gulf coast,

---

[6]Womack adjusted his figures to reflect Appellee's post-injury employment at a salary of $85,000 per year instead of an estimated post-injury earning potential of $40,000 per year estimated by Gorman. With the adjustment, Appellee's loss of future earning capacity ranged from $1.3 million to $3.2 million.

Appellee's cousin got him a job as a contractor with the Corp of Engineers to do quality assurance work.

While under contract with the Corp of Engineers, a friend of Appellee's called to advise him that Crescent Directional Drilling was hiring MWDs. By the time Appellee completed his contract with the Corp of Engineers, the MWD positions had all been filled. He then took a job on a movie set in New Orleans as a laborer hoping an MWD position at Crescent would later become available.[7] In April 2007, he was hired as an MWD trainee by Crescent but was injured on the job eight months later.

During cross-examination, Appellee acknowledged that most of his work history did not involve drilling experience in the oil and gas industry. In fact, he admitted he did not work in drilling until he went to work for Crescent which gave him approximately eight months drilling experience as opposed to the six years testified to by Gorman.

When asked if he had any aspirations to become a direction driller, Appellee testified it was his "goal." He wanted to "get to the top of the MWD" and then "cross train to directional drilling." He knew from his friend who was a directional driller at Crescent that the job paid approximately $200,000 per year.

Gorman's credentials and speculative opinion that Appellee would "probably" have been promoted to the top career in the oil and gas drilling industry were not sufficient to support an award for lost earning capacity. No one from Crescent testified Appellee, or for that matter anyone with his experience and qualifications, was reasonably likely to be advanced or promoted. Without credible proof of an expectation

---

[7]Gorman did not reference this job during his testimony about Appellee's work history.

of a promotion and the consequent increase in salary, Gorman's testimony was purely speculative.

Additionally, Gorman's opinion that Appellee would most likely be promoted to the top position in the drilling industry did not take into account the cyclic nature of the industry. Appellee himself testified he was laid off while employed with Superior Well Service in the 1990s when the "offshore side of [the drilling industry] took a hit due" to the economy. Furthermore, following his injury and transfer to an office job for Crescent, Appellee was also laid off due to the economy.

During the defense's case, a directional driller employed by Crescent testified that in 2008 and 2009, the industry "slowed down quite a bit" and several employees, including him, took a pay cut to keep their jobs. He approximated that forty employees were laid off during that time. When asked if Appellee had ever expressed any interest in becoming a directional driller during the months they worked together, the witness answered, "[n]ot with me." Neither did Appellee make any inquiries to him about directional drilling.

We do not discount Gorman's historical data nor his testimony regarding his methodology and the reliability of statistics and range of salaries used in his evaluation. We agree that anything is possible. *See Richmond & D.R. Co. v. Elliott*, 149 U.S. 266, 267-69 (1893). "[T]here are possibilities and probabilities before every person, particularly a young man, and a jury in estimating the damages sustained will doubtless always give weight to those general probabilities . . . ." *Id.* However, in evaluating loss of earning capacity, the possibility of a plaintiff's promotion or desire to work in a

particular profession must be supported by evidential foundation. *See id.* at 267-69. *Cf. McGrath v. Erie L. R. Co.*, 460 F.2d 1312, 1315 (3rd Cir. 1972) (finding testimony regarding promotion not overly speculative where witness was responsible for decedent's promotion and testified there was a 100% certainty decedent would have been promoted). Ambition, motivation or perseverance without more is insufficient to support damages for loss of future earning capacity. *See Rodriguez v. United States*, 823 F.2d 735, 749 (3rd Cir. 1987) (finding the trial court's calculation of decedent's future earnings based on the probability that he would have obtained employment as a commercial pilot because decedent's wife testified it was his ambition to become a pilot was speculative). Additionally, Gorman's exaggeration of Appellee's drilling experience is refuted by Appellee's own testimony that his actual drilling experience was the eight months he spent working for Crescent prior to his injuries.

The data underlying Gorman's opinion was of such little weight that the jury should not have received his expert opinion on Appellee's lost earning capacity. Resultantly, Womack's testimony based on Gorman's data was likewise of little assistance to the jury and should have been excluded. The trial court did not exercise its gatekeeper function when it opened the door to possibilities and speculation. We conclude the trial court abused its discretion in permitting Gorman to speculate on Appellee's loss of future earning capacity. The trial court likewise abused its discretion in allowing Womack to "crunch the numbers" before the jury based on conjecture.

An expert witness can have an extremely prejudicial impact on a jury. *Robinson*, 923 S.W.2d at 553. To the jury an expert witness is an authority figure who is more believable than a lay witness. *Id.* Consequently, a jury more readily accepts an expert's opinion simply because of the witness's designation as an expert. *Id.* Trial judges have a heightened responsibility to ensure that expert testimony show some indicia of reliability. *Id.* When, as here, a trial judge erroneously admits expert testimony, we are required to conduct a harm analysis.

Erroneous admission of evidence requires reversal only if the error probably (though not necessarily) caused the rendition of an improper judgment. *See* TEX. R. APP. P. 44.1(a)(1); *Nissan Motor Co. v. Armstrong*, 145 S.W.3d 131, 144 (Tex. 2004). The Supreme Court has recognized "the impossibility of prescribing a specific test" for harmless error review. *Reliance Steel & Aluminum Co. v. Sevcik*, 267 S.W.3d 867, 871 (Tex. 2008) (quoting *McCraw v. Maris*, 828 S.W.2d 756, 757 (Tex. 1992)). The standard "is more a matter of judgment than precise measurement." *Armstrong*, 145 S.W.3d at 144.

Erroneously admitted expert testimony that is crucial to a key issue is likely harmful. *State v. Cent. Expressway Sign Assocs.*, 302 S.W.3d 866, 870 (Tex. 2009) (op. on reh'g). In our harm analysis, we examine the entire record and consider whether the erroneously admitted evidence was emphasized and whether it was calculated or inadvertent. *Interstate Northborough P'ship v. State*, 66 S.W.3d 213, 220 (Tex. 2001) (op. on reh'g); *Serv. Corp. Int'l v. Guerra*, 348 S.W.3d 221, 236 (Tex. 2001).

Appellee's lost earning capacity was an integral part of the underlying case. Gorman was allowed numerous times, over objection, to testify that Appellee "probably" would have become an MWD lead engineer or a directional driller. This invited the jury to consider a hypothetical promotion in awarding damages for loss of future earning capacity. During Womack's testimony, the jury was allowed to hear about millions of dollars in lost earning capacity. Uncertainty cannot be made the basis of a legal claim for damages. *Elliott*, 149 U.S. at 269. Accordingly, we find the trial court's erroneous admission of expert testimony of loss of earning capacity harmed Appellants. Issue one is sustained.

### ISSUE TWO
### MEDICAL BILLS – PAID OR INCURRED

Our resolution of issue one suspends consideration of issue two concerning the admissibility of unadjusted gross medical bills, for to do so would constitute an advisory opinion. *See Valley Baptist Med. Ctr. v. Gonzalez*, 33 S.W.3d 821, 822 (Tex. 2000). *See also Petro Pro*, *Ltd. v. Upland Res.*, *Inc.*, 279 S.W.3d 743, 745 n.1 (Tex.App.— Amarillo 2007, pet. denied). When this case was originally tried the trial court did not have the benefit of the Supreme Court's decision in *Haygood v. De Escabedo*. Notwithstanding our decision to not address issue two, upon remand the trial court should consider the implications of *Haygood* on the admissibility of such evidence.

### CONCLUSION

When a trial court has erroneously admitted the only evidence on a contested issue, we ordinarily render the judgment that would have been appropriate had the erroneously admitted evidence been properly excluded. *Guevara v. Ferrer*, 247 S.W.3d

16

662, 670 (Tex. 2007). However, when, as here, there is some evidence to support a loss of earnings capacity damages, but not enough to support the full amount awarded, it is inappropriate for us to render judgment. *See id. See also Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. & Research Corp.*, 299 S.W.3d 106, 124 (Tex. 2009). In the interests of justice, we believe the proper course in this instance is to reverse the trial court's judgment and remand the case for a new trial. *See Estrada v. Dillon*, 44 S.W.3d 558, 560 (Tex. 2001) (concluding that Rule 44.1(b) of the Texas Rules of Appellate Procedure requires a remand of both liability and damages issues when defendants have contested liability in the trial court).

Patrick A. Pirtle
Justice