NO. 07-05-0327-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL A

JUNE 14, 2007

_____

PETRO PRO, LTD., L&R ENERGY CORPORATION, NANCY WILSON BRISCOE,
JUDITH BROCK SEITZ, AND CAROLYN ROGERS, APPELLANTS

V.

UPLAND RESOURCES, INC., KCS RESOURCES, INC., GREAT LAKES ENERGY
PARTNERS, L.L.C., AND STEVE ZEMKOSKI, APPELLEES

_____

FROM THE 31ST DISTRICT COURT OF ROBERTS COUNTY;

NO. 1893; HONORABLE STEVEN R. EMMERT, JUDGE

_____

Before CAMPBELL and HANCOCK and PIRTLE, JJ.

**OPINION**

This appeal concerns a dispute between assignors, assignees, and intervening royalty owners regarding the construction of two oil and gas wellbore assignments, wherein the assignments expressly limited the assigned interest to "rights in the wellbore" of a given well. Presenting similar issues, Appellants, Petro Pro, Ltd. and L&R Energy Corporation, and Intervenors, Nancy Wilson Briscoe, Judith Brock Seitz, and Carolyn Rogers, appeal

the denial of their respective motions for summary judgment and the grant of summary judgment in favor of appellees, Upland Resources, Inc., KCS Resources, Inc., Great Lakes Energy Partners, L.L.C., and Steve Zemkoski. By their issues, Appellants and Intervenors contend the trial court misconstrued the nature and scope of the assigned interest. Appellants also appeal the denial of their motion to have funds tendered into the court's registry. We reverse and render judgment declaring the rights of the parties as to those issues before the trial court.[1]

## Background Facts

### Original Oil and Gas Leases

The two assignments in question pertain to rights in the wellbore of the King "F" No. 2 gas well, located on a 704-acre pooled gas unit in Roberts County. The material facts surrounding the well are not disputed. In September 1992 and 1993, Upland Resources, Inc. (hereinafter individually referred to as "Upland Resources") entered into five oil, gas, and mineral leases involving separate tracts of land in Roberts County. In 1993, Medallion Production Company ("Medallion") acquired the leasehold and spud the King "F" No. 2 well on one of the leased tracts consisting of 500 acres. The tract covered multiple gas-producing formations, including the Brown Dolomite formation, located at depths of

---

[1]Although, ultimately, we seek to declare the ownership interests and rights of the parties, we are constrained to declare only those interests and rights that were at issue before the trial court. The rights and duties set forth herein should not be construed as an exhaustive list of all of the rights and duties arising from the contract between the parties. Any attempt to set forth all of the rights and duties arising from the oil and gas leases at issue would be both foolish and advisory. Judicial authority does not embrace the giving of advisory opinions. *Firemen's Ins. Co. of Newark, N.J. v. Burch,* 442 S.W.2d 331, 333 (Tex. 1968).

2

approximately 3,400 to 3,600 feet, and the Cleveland formation, located approximately 6,500 to 6,600 feet beneath the surface. The King "F" No. 2 well was completed as a gas well in the Cleveland formation and produced gas in paying quantities. Several months after the well was completed, Medallion pooled the 500-acre tract with 204 acres from an adjacent tract to create an irregular shaped, 704-acre gas unit. The leasehold interest in the 704-acre unit was subsequently acquired by KCS Medallion Resources ("KCS") and MB Operating Co., Inc. ("MB"). Eventually, the leasehold area situated horizontally outside the 704-acre unit and vertically below 6,800 feet was released.

*"Wellbore Only" Assignments*

In 1998, for reasons undisclosed in the record, KCS and MB decided that the King "F" No. 2 well was no longer economically viable. Consequently, in November of that year, KCS and MB sold their interests in the well at an auction of oil and gas properties. The winning bidder, L&R Energy ("L&R"), received the interests from KCS and MB via the two assignments in controversy. The assignments were identical in that they both conveyed the following:

> All of Seller's right, title and interest in and to the oil and gas leases described in Exhibit "A" attached hereto and made a part hereof ("Subject Leases") *insofar and only insofar as said leases cover rights in the wellbore* of the King "F" No. 2 Well.

(Emphasis added). Pursuant to the express terms of the assignments, L&R's leasehold interest became effective on December 1, 1998.

3

*New Development Activity*

Several years after the assignments, operators in the area began drilling and completing gas wells in the shallower Brown Dolomite formation. In May 2003, pursuant to a farmout agreement with KCS, Upland Resources entered the pooled gas unit and completed a horizontal gas well in the Brown Dolomite formation. The well, dubbed the Skeeterbee No. 1, traversed within 600 feet of the King "F" No. 2 well. By June 2004, Upland Resources had completed two more gas wells within the 704-acre pooled gas unit, the horizontal Skeeterbee No. 2 and the vertical Skeeterbee No. 3. Both those wells were completed in the Brown Dolomite formation.

Meanwhile, in April 2004, L&R assigned its interest in the King "F" No. 2 well to Petro Pro Ltd. (hereinafter individually referred to as "Petro Pro"). Concerned with Upland Resource's drilling activities, Petro Pro sent a letter to Upland Resources and KCS requesting that both parties clarify their respective interests in the pooled gas unit. Both parties promptly responded with letters stating their belief that Petro Pro did not acquire any leasehold interest outside the confines of the King "F" No. 2 wellbore. Petro Pro replied with a letter stating claims for trespass and conversion and demanding that Appellees vacate the leasehold and cease production from the Skeeterbee wells.

*Suit Filed*

Finally, in September 2004, citing Upland Resources and KCS's refusal to resolve the dispute, Petro Pro and L&R (hereinafter collectively referred to as "Petro") filed the underlying suit against Upland, KCS, and other interested parties, Great Lakes Energy

4

Partners, L.L.C., and Steve Zemkoski (hereinafter collectively referred to as "Upland") for trespass, bad faith trespass, conversion, and money had and received. Petro claimed they owned the exclusive right to produce gas from the entire 704-acre pooled gas unit, from the surface to a depth of 6,800 feet. Petro also sought a declaratory judgment declaring the property rights and ownership interests acquired by the respective parties by virtue of the assignments and an accounting of all proceeds from the sale of gas produced from the Skeeterbee wells. Petro also filed a motion requesting that any production revenue from the Skeeterbee wells be placed into the court's registry until the dispute was resolved. Upland initially responded to the allegations by filing a general denial. Upon learning of the pending dispute between Petro and Upland, the royalty interest owners in the 704-acre pooled gas unit, Nancy Wilson Briscoe, Judith Brock Seitz, and Carolyn Rogers (hereinafter collectively referred to as "Intervenors") filed a plea of intervention seeking damages for the alleged breach of implied covenants and for tortious interference with existing contracts. Intervenors contended that Petro's lawsuit and wrongful claims of ownership prevented Upland from fully developing the lease and protecting the lease from drainage from adjacent wells.

*Competing Motions for Summary Judgment*

On February 1, 2005, Upland filed a motion for summary judgment contending that Petro's rights were limited to the right to produce gas from the Cleveland formation only and the right to "enhance" that production. Upland further contended that Petro's rights were restricted to the physical confines of the King "F" No. 2 well only, without the right to deepen the well to other zones or horizons, or the right to perforate the wellbore casing for

5

the purpose of producing any other zone or horizon lying between the surface and the presently producing section of the Cleveland formation.  Subsequently, Intervenors filed a motion for partial summary judgment contending Petro had the right to produce from any formation subject to governmental regulations, which limited the horizontal extent of Petro's rights to forty acres surrounding the King "F" No. 2 wellbore.  Finally, Petro filed their own motion for summary judgment restating their position that they were the exclusive owners of any portion of leasehold estate that could "reasonably be reached and produced" through the King "F" No. 2 wellbore.

*The Trial Court's Judgment*

Following hearings on the parties' competing motions for summary judgment, the trial court ruled that the King "F" No. 2 wellbore assignments were unambiguous and granted Upland Resources's motion for summary judgment.  The judgment further stated that "[j]udgment is entered in favor of [Upland Resources]."  The court denied Petro and Intervenors' motions for summary judgment and Petro's motion to have funds from production tendered into the court's registry.  The trial court also severed and abated Intervenors' damage claims against Petro.

As drafted, the trial court's judgment does not set forth a declaration of the interest and rights conveyed by the assignments.[2]  From the four corners of the judgment, we are left to speculate as to exactly what the trial court determined the rights of the parties under

---

[2]The judgment merely recites that the assignments in question are "unambiguous" and "grant[s] Defendant's motion for summary judgment and den[ies] Plaintiff's motion for summary judgment and Intervenors' motion for summary judgment . . . ."

the assignments to be. A properly drafted declaratory judgment should terminate the uncertainty or controversy giving rise to suit by declaring the rights of the parties as to those matters upon which the parties joined issue. *Calvert v. Employees Ret. Sys. of Tex.,* 648 S.W.2d 418, 419-20 (Tex.App.–Austin 1983, writ ref'd n.r.e.). *See generally* Robert W. Calvert, *Declaratory Judgments in Texas – Mandatory or Discretionary?,* 14 St.Mary's L.J. 1 (1982). Notwithstanding the fact that the parties may have drafted the judgment and submitted it to the trial court "approved as to form," the failure of the judgment to specifically declare those rights was error.

In a situation where all parties have moved for summary judgment and one motion is granted and the others are denied, the appellate court should review all parties summary judgment evidence and determine all questions presented. *Bradley v. State ex rel. White*, 990 S.W.2d 245, 247 (Tex. 1999). *See also* Tex. R. App. P. 43.2(c). The reviewing court should then render the judgment that the trial court should have rendered. *Bradley,* 990 S.W.2d at 247. The questions presented in this case are, what interest is conveyed by the assignments, and what are the rights of the parties? Therefore, this Court will construe the assignments in question and declare the interests conveyed and rights of the parties as to those matters upon which the parties have joined issue.

By this appeal, Petro and Intervenors urge us to adopt their respective interpretations of the wellbore assignments and contend they are entitled to judgment as a matter of law. Upland Resources, meanwhile, maintains that the trial court correctly construed the assignments in their favor. As previously stated, the trial court's construction is not readily apparent from the face of the judgment. Because a declaration of the

7

property rights and ownership interests of the parties is a matter of law where the instrument is unambiguous, we will examine the assignment language to determine the actual interest conveyed. In doing so, we begin by determining the applicability of some established canons of contract construction.

## Applicability of Canons of Contract Construction

The goal when construing an unambiguous agreement is to determine and give effect to the parties' intent as expressed within the "four corners" of the instrument. *See Gulf Ins. Co. v. Burns Motors, Inc.*, 22 S.W.3d 417, 423 (Tex. 2000); *Luckel v. White*, 819 S.W.2d 459, 461-63 (Tex. 1991). Such intent is garnered from the language used in the writing when read as a whole. *Cross Timbers Oil Co. v. Exxon Corp.*, 22 S.W.3d 24, 26 (Tex.App.–Amarillo 2000, no pet.). Stated differently, we must analyze the entire instrument to understand and harmonize all parts of the instrument so as to give effect to all of its provisions. *Luckel,* 819 S.W.2d at 462; *Questa Energy Corp. v. Vantage Point Energy, Inc.*, 887 S.W.2d 217, 221 (Tex.App.–Amarillo 1994, writ denied). Construction of an unambiguous instrument is a question of law to be resolved by the court. *Luckel,* 819 S.W.2d at 461. We afford the words contained in the agreement their plain, ordinary, and generally accepted meanings, unless the instrument requires otherwise. *E.g., Cross Timbers*, 22 S.W.3d at 27-28; *Sun Operating Ltd. Partnership v. Holt*, 984 S.W.2d 277, 285 (Tex.App.–Amarillo 1998, pet. denied).

By their brief, Petro contends that the absence of express limiting language means that Upland intended to assign their leasehold interest in the entire 704-acre pooled gas unit, including the right to extend one or more horizontal drainholes from the King "F" No.

8

wellbore into other productive areas of the lease. Similarly, Petro insists that the conveyance of "[a]ll of Seller's right, title and interest" in the leases gives them title to all the oil, gas, and minerals beneath the leasehold regardless of where it is located. Petro contends that this interpretation is consistent with the various canons of construction that pertain to conveyances of real property, namely the canon to "construe in favor of the grantee" and the canon of "conveyance of the greatest estate," which they claim is embodied in § 5.001(a) of the Property Code.[3] Furthermore, Petro urges us to consider Upland's actions with respect to other assignments, which are unrelated to the present case but contain similar language.

At the opposite extreme, Upland contends that the assignments should be construed in light of the facts as they existed at the time of conveyance, thereby restricting Petro's rights to the production of gas from the existing wellbore and the Cleveland formation only. While Intervenors agree that operations should be confined to the existing wellbore, they claim that Petro's rights should be construed in such a way that they are limited, in accordance with Railroad Commission well density rules, to an undetermined forty surface acres surrounding the wellbore. Intervenors further contend that the

---

[3]The canon of conveyance of the greatest estate provides that the instrument should be construed to confer to the grantee the largest estate that the terms of the instrument will permit. *See generally* Bruce M. Kramer, *The Sisyphean Task of Interpreting Mineral Deeds and Leases: An Encyclopedia of Canons of Construction,* 24 Tex. Tech L. Rev. 1, 117-24. Section 5.001(a) states that "[a]n estate in land . . . is a fee simple unless the estate is limited by express words or unless a lesser estate is conveyed or devised by construction or operation of law." Tex. Prop. Code Ann. § 5.001(a) (Vernon 2004). *See also Ladd v. DuBose,* 344 S.W.2d 476, 480 (Tex.App.–Amarillo 1961, no writ), *citing Waters v. Ellis,* 158 Tex. 342, 312 S.W.2d 231, 234 (1958).

assignments should be construed so as to allow Petro the right to plug back the wellbore and recomplete the well in the Brown Dolomite formation.

If, after application of the canons of contract construction, an agreement is susceptible of only one reasonable meaning, the contract is unambiguous. The construction of a written, unambiguous instrument is a question of law for the court. *See OTC Petroleum Corp. v. Brock Exploration Corp.*, 835 S.W.2d 792, 794 (Tex.App.–Amarillo 1992, writ denied). In such instance, the courts will give effect to the objective intention of the parties as expressed or as is apparent in the writing, since the parties generally intend every clause to have some effect and in some measure to evidence their agreement. *Id.* Also, extrinsic evidence of other assignments is irrelevant to the parties' intentions in the present case. *See Neel v. Alpar Resources, Inc.*, 797 S.W.2d 361, 363-66 (Tex.App.–Amarillo 1990, no writ) (explaining that an unambiguous instrument will be enforced as written and without consideration of other instruments).

When construing agreements, an agreement which is worded in such a fashion that it can be given a certain or definite legal meaning is not ambiguous and will be enforced as written. *HECI Exploration Co. v. Neel*, 982 S.W.2d 881, 888-89 (Tex. 1998). Here, none of the parties allege that the assignments are ambiguous, and we agree that they are not. Therefore, we restrict our analysis to the plain language of the assignments to determine the nature and scope of the assigned interest. *See Yzaguirre v. KCS Resources, Inc.*, 53 S.W.3d 368, 372-73 (Tex. 2001).

**Nature and Scope of the Assigned Interest**

As recited above, the assignment language describes the assigned interest as "[a]ll of Seller's right, title and interest in and to the oil and gas leases . . . insofar and only insofar as said leases cover rights in the wellbore of the King "F" No. 2 Well."  While the parties agree that this language unambiguously assigns leasehold rights in the King "F" No. 2 wellbore, their interpretations regarding the nature and extent of the estate conveyed differ greatly.

An oil and gas lease conveys an interest in real property, as does the assignment of all or a portion thereof.  *Cherokee Water Co. v. Forderhause,* 641 S.W.2d 522, 525 (Tex. 1982); *ExxonMobil Corp. v. Valence Operating Co.,* 174 S.W.3d 303 (Tex.App.–Houston [1st Dist.] 2005, pet. denied).  A lessee under an oil and gas lease owns a determinable fee in the oil and gas in place.  *Cherokee Water Co.*, 641 S.W.2d at 525.  In this case, the estate conveyed was part of the leasehold estate created by the underlying oil and gas leases.  Therefore, the assignments assigned to Petro a determinable fee interest in the oil and gas in place.

Like the phrase "subject to," the phrase "insofar and only insofar" constitutes a limitation of the grant.  *See, e.g., Walker v. Foss*, 930 S.W.2d 701, 707 (Tex.App.–San Antonio 1996, no writ) (stating that the principal function of such a limitation is protecting the grantor against a claimed breach of warranty).  It neither conveys an interest to the assignee, nor does it reserve or retain an interest in favor of the assignor.  It merely limits the extent of the interest granted.  *Id. at* 706-07.  Consequently, it does not serve to limit

11

the "rights" conveyed to Petro, nor does it reserve to Upland any exclusive rights. Therefore, the assignee, in this case Petro, received all of the rights appurtenant to the estate conveyed. So, what was the estate conveyed and what are the rights appurtenant thereto?

*Estate Conveyed*

To settle this dispute and define the estate conveyed, we must first determine the depth (vertical rights) and area (horizontal rights) covered by the assignments. *See* Lawrence P. Terrell, *Limited Assignments–Who Gets What?,* 35 Rocky Mtn. Min. L. Inst. 17, § 17.02 (1989) (explaining that careful consideration of these two elements is essential to defining the interests transferred and retained). *See also* Kurt M. Peterson, *Wellbores: Shedding Light on a Transactional Black Hole,* 48 Rocky Mtn. Min. L. Inst. 13, §13.08[3][d] (2002). This information, in turn, will allow us to define the extent of assignees' leasehold rights in the King "F" No. 2 wellbore.

*Vertical Limit of Assignment*

Regarding this issue, Upland contends that the "plain, grammatical meaning" of the words used in the assignments limits the assigned interest to the horizon that was open in the wellbore on the date of the assignments. In other words, Upland claims Petro's rights are strictly limited to the Cleveland formation. But adopting this stance would be inserting language into the assignments that does not exist. Furthermore, it would require a determination of the facts, outside the four corners of the assignment, to ascertain the extent of the interest transferred. Contrary to Upland's contention, the assignments are

completely devoid of language limiting Petro's leasehold interest to the Cleveland formation. Without such limiting language, we find no support for Upland's contention and agree with Petro and Intervenors' contention that the assignment language does not limit wellbore operations to a specific depth or formation. Therefore, we hold that the vertical limit of the assignments is defined by the depth of the wellbore as assigned.

*Horizontal Limit of Assignment*

Similarly, there is a lack of support for Petro's claim that they acquired horizontal rights coextensive with the 704-acre pooled gas unit and Intervenors' claim that Petro acquired leasehold rights in forty surface acres surrounding the King "F" No. 2 wellbore. Just as the assignment language does not restrict Petro's operations to a specific vertical producing interval, it also does not expressly or impliedly convey leasehold rights in any horizontal surface acreage. *Cf.* David E. Pierce, *An Analytical Approach to Drafting Assignments,* 44 Sw. L.J. 943, 955 (1990) (explaining that, presumably, the assignee is entitled to the production allocated to the [lease] well even though he owns none of the required leasehold acreage).

On the issue of the horizontal extent of the estate conveyed, Intervenors cite the language in the assignments stating that the assigned interests are "subject to . . . governmental regulations." Relying on this "governmental regulations clause," Intervenors contend that, pursuant to Railroad Commission Rule 38, when Petro acquired rights in the King "F" No. 2 wellbore, they also acquired rights in the minimum amount of surface acreage needed to obtain a plug back permit for recompletion in the Brown Dolomite

13

formation. *See* 16 Tex. Admin. Code §§ 3.5., 3.38. (2007) (Tex. R.R. Comm'n, Application To Drill, Deepen, Reenter, or Plug Back; Well Densities). We disagree.

As Intervenors acknowledge, the Railroad Commission is a regulatory agency and lacks the authority to determine ownership of land or property rights. *See, e.g., Amarillo Oil Co. v. Energy-Agri Products, Inc.*, 794 S.W.2d 20, 26 (Tex. 1990). The government regulations clause does not provide for additional leasehold rights contingent upon the assignee seeking to commence certain wellbore operations. Simply put, there is nothing in the assignments that suggests that, because the assigned interest is subject to governmental regulation, the nature and scope of the interest assigned may vary. For this reason, we find Intervenors position to be inconsistent with the plain language of the assignments.

Because the assignments are limited to "rights in the wellbore" we must determine what the parties intended by that term. The assignments do not describe the King "F" No. 2 wellbore or even define the term "wellbore," therefore, we must turn to its generally accepted meaning. A wellbore, sometimes called a borehole, is the hole in the ground created by the process of drilling or boring a well. 8 Patrick H. Martin & Bruce M. Kramer, *Williams & Meyers Oil and Gas Law, Manual of Terms,* 107, 1207 (9th ed. 1998). A well, meanwhile, is defined as the "orifice in the ground made by drilling, boring or any other manner, from which any petroleum or gas is obtained or obtainable . . . ." *Id.* at 1205. When read in context with the assignment language, these definitions indicate that Petro's leasehold rights extend horizontally only to the area of the hole identified as the King "F"

14

No. 2 well and, by implication, such surface area adjacent thereto as is reasonably necessary to operate the well.

*Rights Appurtenant*

Consistent with the horizontal and vertical limitations of Petro's interest, the assignments also conveyed all rights appurtenant to the underlying oil and gas leases. One of those rights was the right to develop the leased premises for the purpose of "exploring, drilling, mining, operating for and producing oil, gas and other minerals." To that extent, Petro's interest was not limited to production of gas from the Cleveland formation. Therefore, subject to governmental regulations, the assignments in question granted Petro the right to rework the King "F" No. 2 well so as to produce from any formation that might possibly be reached from the existing wellbore. This right to develop, however, does not extend beyond the present confines of the wellbore. In other words, Petro does not have the right to extend the present well beyond its current depth, nor does it have the right to drill horizontally beyond the confines of the existing wellbore.

Another one of the rights assigned was the right to produce. Subject to the duties imposed by the lease (*e.g.*, the duty to pay the original lessor a royalty for oil or gas taken, the duty to pay for damages occasioned by its operations, and the duty to restore the surface upon abandonment of the well), Petro has the exclusive right to produce oil and gas from the King "F" No. 2 well. Conversely, because the assignments in question did not transfer Upland's determinable fee interest in the oil and gas in place outside of the wellbore, Petro does not own an interest in the oil and gas in place outside the confines of the King "F" No. 2 well. For these reasons, completion of the Skeeterbee wells did not

15

constitute a trespass onto property which Petro owned. For these same reasons, the production of gas from the Skeeterbee wells did not constitute conversion of property belonging to Petro. Because Petro does not have an ownership interest in the gas produced from the Skeeterbee wells, Petro is not entitled to a portion of the proceeds or to an accounting.

To the extent that the leases embodied other rights not exclusive to the possession and use of the wellbore in question (*e.g.*, the right to extend the lease by the payment of shut-in royalties), the assignment created a co-tenancy with the other lessees, with each party sharing those incorporeal appurtenant rights.

The practical effect of this construction is that Petro owns the exclusive right to produce any oil, gas, or other minerals that may be produced from the King "F" No. 2 wellbore, consistent with the terms and conditions of the original leases. Subject to governmental regulations, Petro also owns the right to develop the wellbore and conduct any operations within the wellbore that would facilitate or enhance that development and production, including the right to produce from other formations. Upland retained the exclusive right, subject to the terms and conditions of the original leases and any applicable governmental regulations, to produce any oil, gas, or other minerals that may be extracted from the leased premises, other than through the King "F" No. 2 wellbore. Although this construction describes a relatively restrictive leasehold interest, it is consistent with the fact that, from an area standpoint, a wellbore assignment is the narrowest form of oil and gas assignment. Lawrence P. Terrell, *Limited Assignments–Who Gets What?,* 35 Rocky Mtn. Min. L. Inst. 17, § 17.02 (1989).

16

Our learned colleague's dissenting opinion states, "Rather than concluding the parties intended to grant Petro the right to recomplete the well to produce *gas it does not own*, we would construe the assignments' language in a manner consistent with our state's ownership-in-place theory." (*emphasis added*)  While the concept of producing oil and gas that one does not own may seem *unfair*, it is hardly inconsistent with the ownership-in-place theory of mineral ownership.  To the contrary, it is entirely consistent with over a hundred years of precedent pertaining to the corollary doctrine of the "rule of capture."[4] The rule of capture is a rule of non-liability that determines what remedies, if any, that an adjacent landowner has against his neighbor for production of migratory subsurface minerals belonging to the owner-in-place.  Essentially, the rule provides that, absent malice or willful waste, landowners have the right to produce any migratory subsurface minerals that they can "capture" without being liable to their neighbor, even if in doing so they deprive their neighbor of their ownership interest in the actual minerals.  *See Sipriano v. Great Spring Waters of America, Inc.,* 1 S.W.3d 75 (Tex. 1999) (discussing the correlative rights of adjacent landowners to produce groundwater).  Even though the legal effect of this Court's interpretation is to allow Petro the right to produce gas that it does not own until it captures it, and merely because that result may seem to be inconsistent with what reasonable people would consider fair, that interpretation does give effect to the intent expressed within the "four corners" of the instrument.  It has long been recognized that, absent exigent circumstances, even though the intent of the parties may seem illogical, the law will not protect you from an improvident bargain.[5]

---

[4]The Texas Supreme Court adopted the common-law rule of capture in 1904 in the case of *Houston & Texas Central Railway Co. v. East,* 98 Tex. 146, 81 S.W. 279 (1904).

[5]*High Plains Nat. Gas Co. v. Railroad Com'n of Tex.,* 467 S.W.2d 532 (Tex.Civ.App.–Austin, 1971, *writ ref'd n.r.e.);  Carter v. Carter,* 5 Tex. 93, 1849 WL 4064 (Tex. 1849).

**Conclusion**

In summary, we find that the trial court erred in rendering its declaration of the rights of the parties. To that extent, Intervenor's sole issue and Petro's issues one though three are subsumed within the disposition of Petro's fourth issue, which is sustained in part (as to the granting of summary judgment in favor of Upland's construction of the assignments) and overruled in part (as to the denying of Petro's Motion for Partial Summary Judgment and Intervenor's First Amended Motion for Partial Summary Judgment in favor of their respective construction of the assignments). Because we also find that Petro did not have title to the oil and gas in place outside of the King "F" No. 2 wellbore, we conclude that they would not be entitled to an accounting of future production from the Skeeterbee wells.[6] Because Petro would not be entitled to have funds from current production tendered into the court's registry, Petro's fifth issue regarding the same is also overruled.

We reverse the judgment of the trial court and render judgment declaring that the wellbore assignments in question transfer to the assignee an estate that extends to the physical limits of the wellbore, together with all of the appurtenant rights incident to the underlying lease. Accordingly, the plain language of the assignments conveys to Petro the oil, gas and other minerals in place within the confines of the King "F" No. 2 wellbore, together with those rights appurtenant to the original leases as may be necessary to the production of those minerals and to the full use and enjoyment of that wellbore, including,

---

[6]We express no opinion as to whether or not Petro may be entitled to an accounting of past production based upon any claim of damages which might have resulted from any tortious interference with their right of production for the reason that no such claims have been made.

18

but not limited to the right to produce from any formation traversed by the wellbore. As a result, Petro did not acquire title to the gas in place outside of the King "F" No. 2 wellbore or the right to extend the existing wellbore into other areas of the lease. We further hold that Upland retains their respective interest in the remainder of the leasehold estate, and the rights appurtenant thereto. Petro's claims of trespass, bad faith trespass, conversion, and money had and received are dismissed and their request that monies from current production from the Skeeterbee wells be placed into the registry of the court is denied.

Patrick A. Pirtle<br>
Justice

Campbell, J., concurring and dissenting.