

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

_____

No. 07-12-00359-CV

_____

UNIT PETROLEUM COMPANY, APPELLANT

V.

DAVID POND WELL SERVICE, INC.,
D/B/A, D.W.P. PRODUCTION, APPELLEE

On Appeal from the 31ˢᵗ District Court
Lipscomb County, Texas
Trial Court No. 11-04-4287; Honorable Steven Emmert, Presiding

May 19, 2014

OPINION

Before CAMPBELL and HANCOCK and PIRTLE, JJ.

Appellant, Unit Petroleum Company, appeals a judgment in favor of Appellee, David Pond Well Service d/b/a D.W.P. Production, in its action for a declaratory judgment related to the construction of two mineral leases: (1) an *Oil, Gas and Mineral Lease* between Unit, as Lessee, and Everett and Lora Tarbox, as Lessors, and (2) a subsequently executed *Wellbore Oil & Gas Lease* between Pond, as Lessee, and the

Tarboxes, as Lessors.[1]  Furthermore, Unit seeks to "quiet title" to its leasehold interest, particularly as it pertains to the right of a mineral interest owner to designate a proration unit for purposes of obtaining a permit to produce under appropriate governmental regulations.  Unit contends the trial court erred (1) by failing to give effect to the plain language of its unambiguous lease, (2) in finding Pond ratified an earlier designation of an eighty acre proration unit[2] and (3) in ruling Unit is estopped from challenging Pond's claim to an appurtenant contractual right under its lease to designate a proration unit for the wellbore which would encompass portions of Unit's leasehold estate.  We reverse the judgment of the trial court, render judgment declaring the rights of the parties as to those issues before this Court and remand for further proceedings consistent with this opinion.[3]

## Background

Prior to 2003, the Tarboxes owned the south one-half of Section 539, Block 43, H.&T.C. RR. Co. Survey, Lipscomb County, Texas, containing 320 acres, more or less, encumbered by a then-existing oil, gas and mineral lease (designated for regulatory purposes by the Texas Railroad Commission as Lease No. 05840).  By 2003, that prior

---

[1] Unit and Pond have stipulated that the terms of both leases are unambiguous.

[2] A proration unit is defined as "the acreage assigned to a well for the purpose of assigning allowables and allocating allowable production to the well" for regulatory purposes.  16 TEX. ADMIN. CODE § 3.38(a)(3) (West 2013).

[3] In addition to injunctive relief, the trial court will need to reconsider issues relating to damages and attorney's fees which were severed from the original lawsuit.  Although we seek to declare the ownership interests and rights of the parties, we are constrained to declare only those interests and rights that were at issue before the trial court.  The rights and duties set forth herein should not be construed as an exhaustive list of all of the rights and duties arising from the two mineral leases executed by the Tarboxes.  Any attempt to set forth all of the rights and duties arising from those leases would be both foolish and advisory.  Judicial authority does not embrace the giving of advisory opinions.  *See Petro Pro, Ltd. v. Upland Res., Inc.,* 279 S.W.3d 743, 745 n.1 (Tex. App.—Amarillo 2007, pet. denied) (citing *Firemen's Ins. Co. of Newark, N.J. v. Burch,* 442 S.W.2d 331, 333 (Tex. 1968)).

lease had been assigned to BP America Production Company. In 1985, BP's predecessor, Vance Oil & Gas, Inc., drilled a well on the property and designated it the Tarbox #1. By the end of 2003, the Tarbox #1 had ceased to produce in paying quantities. BP acknowledged the well as a non-producing well and abandoned it, thereby allowing that lease to terminate.

Thereafter, on July 19, 2005, the Tarboxes, as lessors, executed a new *Oil, Gas and Mineral Lease*, in favor of Armer & Quillan, L.L.C., as lessee, covering the same property, in return for a bonus of $150 per acre—or approximately $48,000. Approximately five months later, Armer & Quillan assigned that lease to Unit Petroleum Company; therefore, for purposes of this opinion we refer to that lease as the "Unit Lease." The Unit Lease provided, in pertinent part, as follows:

> 1. Lessor . . . hereby grants, leases and lets exclusively unto Lessee for the purpose of (a) exploring, prospecting, drilling and mining thereof for the producing therefrom, and from lands operated therewith, oil, gas and all other minerals, (b) saving, treating, transporting and caring for said products, (c) removing therefrom, and from lands operated therewith, water, brine and other refuse, injecting the same, gas, and any other substances into the subsurface thereof, (d) exercising all rights and privileges hereinafter granted to Lessee, and (e) constructing, operating and maintaining thereon all structures and facilities necessary or convenient for any and all said purposes, together with reversionary rights of Lessor, the following described land in Lipscomb County, Texas, to-wit:
>
> The S/2 of Section 539, Block 43, H&TC Survey covering 320.00 acres more or less.
>
> See Exhibit "A" attached hereto and made a part of this lease. . . .
>
> The lease covers all of the land described above, and in addition thereto there is hereby leased, let and demised to the same extent as if it were described herein specifically, whether the same be in said survey or in adjacent surveys, all land owned or claimed by Lessor adjacent to the land herein-above particularly described . . . .

3

* * *

4.  Lessee is granted the right and power to pool all or any part of the leased premises with any other lands, as to any stratum or strata and as to any mineral or minerals, and as to all or any interests therein, and by whomsoever owned, for development and operation of the same as a unit or units. . . .

* * *

8.  The rights of either party hereunder may be assigned in whole or in part . . . .

* * *

10.  Lessor hereby warrants and agrees to defend the title to the leased premises.

* * *

Exhibit "A"

Notwithstanding any of the provisions of this lease to the contrary, it is additionally agreed as follows:

RESERVATION OF WELLBORE OF TARBOX UNIT #1:  LESSOR reserves the wellbore of the Tabox (sic) Unit #1 well located on the leased premises, to be produced by LESSOR or his assigns and lessees.  This reservation only applies to the wellbore as it currently exists and production only from the Cleveland formation, defined herein as between the depths of 7,930 feet subsurface to 7,990 feet subsurface, in which the wellbore is currently completed.

At the time the Unit Lease was executed, no oil, gas or other minerals were actually being produced from the Tarbox #1.

On July 25, 2005, six days after executing the Unit Lease, the Tarboxes, as lessors, executed a *Wellbore Oil and Gas Lease* in favor of David Pond Well Service, Inc., as lessee, hereinafter the "Wellbore Lease," in return for a twenty-five percent royalty fee.  The Wellbore Lease provided, in pertinent part, as follows:

4

LESSOR . . . does hereby grant, lease and let exclusively unto LESSEE, its successors and assigns, for the purpose of exploring, drilling, and operating for and producing oil, and/or gas, and to produce, save, take care of, treat, transport and own said substances, the following described land in Lipscomb County, Texas, to-wit:

> That portion of the South Half (S/2 of Section 539, Block 43, H.&T.C. RR. Co. Survey, Lipscomb County, Texas, limited to the Cleveland zone wellbore of the Tarbox #1 well, said Cleveland zone defined herein as between the depths of 7,930 feet subsurface to 7,990 feet subsurface, and such land is hereinafter referred to as the "Leased Premises."

Notwithstanding anything herein to the contrary, LESSEE's right of exploring, drilling and operating for and producing oil and/or gas from the Leased Premises shall be confined to the existing borehole of the Tarbox #1 well, located 467 feet from the South line and 457 feet from the West line of Section 539, Block 43, H.&T.C. RR. Co. Survey, Lipscomb County, Texas, and any exploration, drilling, or production operations conducted by LESSEE at any other location upon the Leased Premises shall be considered a trespass for any and all purposes. By execution of this lease, the LESSOR assigns to LESSEE any and all rights that LESSOR has in any of the equipment above the ground or in the wellbore of the Tarbox #1 well.

* * *

9. DISCLAIMER OF WARRANTY. It is expressly agreed between the parties hereto that no warranty or covenant of title (express or implied) to the land covered hereby or to the oil and gas therein or produced therefrom is made by LESSOR and that no warranty, covenant, or guarantee of title shall be created by or arise from this lease.

The Wellbore Lease was recorded in the real estate records of Lipscomb County on August 2, 2005, and the Unit Lease was recorded September 14th. Pond stipulated during trial and on appeal that the interest acquired by virtue of the Wellbore Lease is a leasehold estate limited to "a fee simple determinable estate in the Cleveland zone from a depth of 7,930 feet to 7,990 feet in the 5 and 1/2 [inch] diameter or 17 and 1/4 [inch] circumference of the wellbore of the Tarbox #1 well located 467 feet from the South line

5

and 467 feet from the West line of Section 539, Block 43, H.&T.C. RR. Co. Survey, Lipscomb County, Texas."[4]

Contained within the record is a sixty-five page exhibit which the parties stipulate contains certified copies of documents filed with the Texas Railroad Commission relating to the Tarbox #1 well. That exhibit contains documents showing the Tarbox #1 was drilled in 1984 on a pooled unit consisting of the north and south halves of Section 539. Although drilled to a total depth of 9,500 feet, testing deeper formations, the well was completed in the Cleveland formation. For the Cleveland formation completion, the operator designated a drilling unit consisting of the south half of Section 539. In August 1984, the well was classified as an oil well and placed in the Lipscomb, S.E. (Cleveland) field. In October 1984, the Railroad Commission approved a form P-4 changing the well's operator to Vance Oil & Gas, Inc. The exhibit further contains an undated plat, prepared on Vance Oil & Gas, Inc. letterhead and certified as correct by John A. Vance, the company's president. The plat depicts the location of the "V.O. & G. Tarbox #1" within an outline of the west half of the southwest quarter of Section 539, bearing the notation "80 ac. Cleveland proration unit." The plat bears handwritten notations including the lease number 05840 and "Lipscomb, SE (Cleveland)." The Railroad Commission records further contain a form P-4, filed in August 2005, signed by BP and Pond, making application to change the operator of the Tarbox #1 well from BP to

---

[4] A wellbore is the hole in the ground created by the process of drilling or boring a well. *Petro Pro, Ltd.,* 279 S.W.3d at 751 (citing 8 Patrick H. Martin & Bruce M. Kramer, *Williams & Meyers Oil and Gas Law, Manual of Terms,* 107, 1207 (9th ed. 1998)). A well, meanwhile, is defined as the "orifice in the ground made by drilling, boring or any other manner, from which any petroleum or gas is obtained or obtainable . . . ." *Id.* (citing *Williams & Meyers Oil and Gas Law,* 107, 1205).

Pond.[5] By that application, Pond sought a change of operator under lease name "Tarbox" and lease number "05840." Absent from those same records are any documents establishing the Railroad Commission was provided a copy of the Wellbore Lease, the Unit Lease, or any other document showing Pond's leasehold interest as being limited to the circumference of the Tarbox #1 wellbore. The Railroad Commission records further show Pond's P-4 application to change operators was approved the same day it was filed. Since that change of operators, Pond has produced the Tarbox #1 well.

In 2008 and 2010, Unit drilled three wells in the south one-half of Section 539, Block 43, H.&T.C. RR. Co. Survey, designating the wells as the Laubhan B1H, Laubhan 2H, and Laubhan B3H. After Unit's wells were drilled, Pond noticed a drop in the wellhead pressure at Tarbox #1 wellbore. Pond complained to the Railroad Commission, asserting that Unit's Laubhan wells B1H and B3H were drilled in violation of Vance's 1984 proration plat showing an eighty acre proration unit assigned to the Tarbox #1 wellbore. In response to Pond's complaints, in December 2010, Unit sought relief from the Railroad Commission by filing an *Application for the Establishment of Proration Units*, assigning Pond's wellbore a forty-acre proration unit.[6] In January 2011, Unit withdrew its *Application* after Pond filed a complaint with the Railroad Commission. In April 2011, Unit filed its *Supplemental Verified Petition for Temporary Injunction and*

---

[5] The record further reflects that Pond paid BP $40,000 for its surface and downhole equipment installed on the well.

[6] The *Final Order Amending Field Rules for Lipscomb, S.E. (Cleveland) Field Lipscomb County, Texas,* approved by the Railroad Commission in December 2006 provided that, under Rule No. 3, standard drilling and proration units would be 160 acres rather than 80 acres and "[a]n operator, at his option, shall be permitted to form optional drilling units of 40 acres."

*Permanent Injunction, Trespass To Try Title and Declaratory Judgment* in this proceeding.[7]

Following a bench trial and post-trial briefing, the trial court interpreted the parties' leases and held: (1) the Wellbore Lease created an appurtenant contract right in Pond's favor permitting him to exclusively assign, designate and/or claim an eighty acre proration unit for Pond's wellbore and (2) Unit was estopped from asserting ownership of an exclusive right to designate a proration unit for Pond's wellbore. This appeal followed.

## CANONS OF CONTRACT CONSTRUCTION

"An oil and gas lease is a contract and must be interpreted as one." *Sabre Oil & Gas Corp. v. Gibson,* 72 S.W.3d 812, 816 (Tex. App.—Eastland 2002, pet. denied). In construing a written contract, the primary concern is to ascertain and give effect to the parties' intentions as expressed in the document. *Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 311-12 (Tex. 2005) (*per curiam)*. We consider the entire writing and attempt to harmonize and give effect to all of the contract's provisions. *Id.* at 312. We construe contracts "from a utilitarian standpoint bearing in mind the particular business activity sought to be served" and "will avoid when possible and proper a construction which is unreasonable, inequitable, and oppressive." *Id.* (quoting *Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 530 (Tex. 1987)). Furthermore, the language in a contract is to be given its plain, ordinary, and generally accepted meanings unless

---

[7] The Railroad Commission is holding Pond's complaint in abeyance until Unit's claims are finally decided by the courts.

8

doing so would defeat the parties' intent. *Petro Pro, Ltd. v. Upland Res., Inc.,* 279 S.W.3d 743, 749 n.3 (Tex. App.—Amarillo 2007, pet. denied).

If, after the pertinent rules of construction are applied, the contract can be given a definite or certain legal meaning and it is unambiguous, then we construe it as a matter of law. *Frost Nat'l Bank*, 165 S.W.3d at 312. However, if after such rules are applied, the meaning of the contract remains uncertain or is susceptible to more than one reasonable interpretation, it is ambiguous. *Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.,* 907 S.W.2d 517, 520 (Tex. 1990). Whether a contract is ambiguous is a question of law to be determined "by looking at the contract as a whole in light of the circumstances present when the contract was entered," and extrinsic evidence of intent is admissible only if the contract is ambiguous on its face. *See Friendswood Dev. Co. v. McDade & Co.*, 926 S.W.2d 280, 283 (Tex. 1996). We have reviewed the leases at issue and agree with the parties' stipulation that their provisions are unambiguous.

## DISCUSSION

Unit asserts the trial court erred in its determination that the Wellbore Lease grants Pond an appurtenant contractual right to designate or establish a proration unit extending beyond the physical limits of Pond's leasehold estate. Unit contends the Unit Lease granted it a fee simple determinable in the south one-half of Section 539, Block 43, H.&T.C. RR. Co. Survey, which encompasses the entire acreage surrounding the Tarbox #1 well, subject to the reservation of the wellbore *only*. Unit further contends it was granted and still retains the exclusive executive right to establish a proration unit encompassing any part of its leasehold estate. On the other hand, Pond asserts the

9

parties intended the operator of the Tarbox #1 to be entitled to dictate the size and configuration of a proration unit of sufficient acreage necessary to allow the well's production under appropriate governmental regulations. While we agree Unit has the exclusive executive right to establish a proration unit encompassing any part of its leasehold estate, under the facts of this case, we find that right is burdened by an implied duty, owed to the owner of the reserved wellbore, to designate a proration unit that will allow production from that wellbore under applicable governmental regulations.

Because Pond stipulated to the vertical and horizontal limits of its lease, a discussion of the estate conveyed to Pond pursuant to the Wellbore Lease is unnecessary. *See generally Petro Pro, Inc.,* 279 S.W.3d at 750-51. Distilled to its essence, Pond's contention at trial and on appeal is that the Wellbore Lease granted it an appurtenant right to designate a proration unit, comprised entirely of property belonging to Unit's leasehold estate, because the Wellbore Lease permits Pond to "operate" and "produce oil and/or gas" from the Tarbox #1 wellbore. As discussed below, we disagree.

An oil and gas lease is a contract conveying an interest in real property, as does the assignment of all or a portion thereof. *Petro Pro, Ltd.*, 279 S.W.3d at 750 (citing *Cherokee Water Co. v. Forderhause,* 641 S.W.2d 522, 525 (Tex. 1982)). That said, in Texas, an oil and gas "lease" is not a lease in a traditional sense, but rather, it "grants a fee simple determinable interest to the lessee, who is actually a grantee." *Natural Gas Pipeline Co. of Am. v. Pool,* 124 S.W.3d 188, 192 (Tex. 2003). Thus, either a deed or a lease of a mineral estate severs the mineral estate from the surface. *See, e.g., Moser v. U.S. Steel Corp.,* 676 S.W.2d 99, 102 (Tex. 1984) (for the proposition that "the

general intent of parties executing a mineral deed or lease is presumed to be an intent to sever the mineral and surface estates"); *Pounds v. Jurgens,* 296 S.W.3d 100, 107 (Tex. App.—Houston [14th Dist.] 2009, pet. denied).

When the mineral and surface estates are severed, the mineral estate becomes the dominant estate, *Prop. Owners of Leisure Land, Inc. v. Woolf & Magee, Inc.,* 786 S.W.2d 757, 760 (Tex. App.—Tyler 1990, no pet.) (citing *Acker v. Guinn,* 464 S.W.2d 348, 352 (Tex. 1971)); *Key Operating & Equipment, Inc. v. Hegar,* 403 S.W.3d 318, 326 (Tex. App.—Houston [1st Dist.] 2013, pet. granted, Dec. 13, 2013) (collected cases cited therein), and under the common law, the owner or lessee of the dominant mineral estate has a right to develop the minerals, which includes "an implied right to use the surface estate in ways reasonably necessary to carry out its operations." *See SWEPI LP v. R.R. Comm'n of Tex*., 314 S.W.3d 253, 256 (Tex. App.—Austin 2010, pet. denied). *See also Tarrant Cnty. Water Control & Imp. Dist. No. One v. Haupt, Inc.*, 854 S.W.2d 909, 911 (Tex. 1993) (stating "the right to the minerals carries with it the right to enter and extract them" because "a grant or reservation of minerals would be wholly worthless if the grantee or reserver could not enter upon the land in order to explore for and extract the minerals granted or reserved).[8]  Furthermore, unless a contrary intention is expressed, the executive right to make decisions concerning the development and production of the mineral estate is a title right that follows ownership of the minerals. *Lesley v. Veterans Land Bd.*, 352 S.W.3d 479, 486 (Tex. 2011).

The Unit Lease reserved to the Tarboxes, "the wellbore of the Tabox (sic) Unit #1

---

[8] This is sometimes referred to as an "implied surface easement."  *See Prop. Owners of Leisure Land, Inc.,* 786 S.W.2d at 760.

well located on the leased premises, to be produced by Tarbox or his assigns and lessees." The reservation was limited "to the wellbore as it currently exists and production only from the Cleveland formation [in the sixty-foot interval] in which the wellbore is currently completed." The reservation contains no language reserving to the Tarboxes any right to use acreage outside the wellbore. Specifically, the Unit Lease does not reserve to the Tarboxes the executive right to assign property outside the wellbore to a proration unit for purposes of a production allowable. As previously noted, Pond stipulates the mineral interest embodied in the reservation[9] is limited to the wellbore itself. While Pond and the trial court construe that reservation as carrying with it "the contractual right . . . for regulatory purposes only, to assign, designate and/or claim the 80 acre proration unit for the Tarbox #1 well that was on file with the Railroad Commission at the time . . . ," we find such a construction to be unreasonable.

What is not clear to us and what we find unreasonable to infer from the language employed by the parties to the wellbore reservation is that the parties intended the Tarbox #1 operator to have use of the eighty-acre tract reflected in the plat apparently filed with the Railroad Commission in the 1980s when all the south half of the section was held under a single lease and the Tarbox #1 was the only well on that lease. What also is not clear to us and what we further find unreasonable about Pond's position is the assertion that the parties intended the operator of the Tarbox #1 to be entitled to dictate the size and configuration of the acreage necessary for the well's production. The language of the reservation does not support such a position and nothing in this

---

[9] It is not necessary for us to attempt a characterization of the interest reserved by the Tarboxes. But however characterized, the interest is determinable because the grant to the lessee in the Unit lease includes the "reversionary rights of [Tarbox]."

record demonstrates that use of acreage selected by Pond is necessary for the "proper and lawful exercise" of its right to produce the Tarbox #1 well. *See Stradley v. Magnolia Petroleum Co.*, 155 S.W.2d 649, 651 (Tex. Civ. App.—Amarillo 1941, writ ref'd); *Frost Nat'l Bank*, 165 S.W.3d at 311-12 (reservation of a right to occupy land carries with it all rights necessary to the proper and lawful exercise of that right of occupancy as construed from a utilitarian standpoint bearing in mind the particular activity involved). Pond's interpretation would give the reserved wellbore interest holder rights that are greater than necessary to enable Pond to produce from the existing wellbore. Furthermore, as this dispute demonstrates, Pond's interpretation would grant rights that interfere with the development activities clearly anticipated and intended by the Tarboxes and Unit when the Unit Lease was executed.[10]

Here, Unit's leasehold estate includes the "oil, gas and all other minerals" underlying the entire "S/2 of Section 539, Block 43 Survey covering 320.00 acres," and it is the dominant estate over the surface subject to the reservation of the wellbore only. Accordingly, Unit has the right to use the surface area of its leasehold estate "to the extent that is reasonably necessary to develop and produce the minerals." *Prop. Owners of Leisure Land, Inc.,* 786 S.W.2d at 760 (collected cases cited therein). In addition to this implied surface right easement, Unit also has "[t]he executive right . . . to make decisions affecting the exploration and development of its mineral estate." *See Lesley,* 352 S.W.3d at 487 ("The executive right is the right to make decisions affecting

---

[10] *See* D. Davin McGinnis, Impact of Railroad Commission Rules on Leases, (Wellbore) Assignments and Related Issues, State Bar of Texas, 26th Annual Advanced, Oil, Gas & Energy Resources Law Course (2008) (discussing issues arising from wellbore assignments).

the exploration and development of the mineral estate . . . .").[11]  When, as here, a lessee receives an undivided mineral interest in a leasehold estate, it is presumed that all attributes remain with the mineral interest conveyed, including the executive right to development, unless a contrary intention is expressly reserved or excepted in the lease or deed.  *Id.* at 486 ("When a mineral interest is conveyed, the executive right incident to that interest passes to the grantee unless specifically reserved.").  *See French v. Chevron U.S.A., Inc.*, 896 S.W.2d 795, 797 n.1 (Tex. 1995) ("the right to develop is a correlative right and passes with the executive rights").[12]  Because the Tarboxes did not expressly reserve any executive rights related to any portion of the Unit Lease or the Wellbore Lease, the executive right to develop the entire 320 acres encapsulating the Tarbox #1 wellbore, save and except the 5½ inch wellbore of that well, passed to Unit under its lease.  *See Chesapeake Exploration, L.L.C. v. BNW Property Co.,* 393 S.W.3d 852, 855-857 (Tex. App.—El Paso 2012, pet. denied) (discussing the Texas Supreme Court's similar holdings in *Lesley v. Veterans Land Bd.,* 352 S.W.3d 479 (Tex. 2010) and *Day & Co., Inc. v. Texland Petroleum, Inc.*, 786 S.W.2d 667 (Tex. 1990)); *Anadarko Petroleum Corp. v. BNW Property Co.,* 393 S.W.3d 846, 850-851 (Tex. App.—El Paso 2012, pet. denied).[13]  Concomitantly, the executive right to establish a proration

---

[11] There are five essential attributes to a severed mineral estate:  (1) the right to develop (the right of ingress and egress, (2) the right to lease (the executive right), (3) the right to receive bonus payments, (4) the right to receive delay rentals, [and] (5) the right to receive royalty payments.  *Lesley v. Veterans Land Bd.,* 352 S.W.3d 479, 481 n.1 (Tex. 2010) (quoting *Altman v. Blake*, 712 S.W.2d 117, 118 (Tex. 1986)).  *See also Day & Co., Inc. v. Texland Petroleum, Inc.*, 786 S.W.2d 667, 669 (Tex. 1990) ("[T]he executive right is an interest in property, an incident and part of the mineral estate like the other attributes such as bonus, royalty and delay rentals.").

[12] This is consistent with"[t]he canon of conveyance of the greatest estate provid[ing] that the instrument should be construed to confer to the grantee the largest estate that the terms of the instrument will permit."  *Petro Pro, Ltd.,* 279 S.W.3d at 748 n.3 (citations omitted).

[13] Stated conversely, Pond's leasehold estate does not include the executive right to designate a proration unit encompassing any acreage that is covered by Unit's leasehold estate.  It is axiomatic that

unit encompassing all or any part of the Unit leasehold estate passed exclusively to Unit.

Accordingly, because the Tarboxes did not expressly reserve any executive rights in either the Unit Lease or the Wellbore Lease, the executive right to make decisions concerning the development and production of the respective mineral estates vested in the owner of that estate. Unit's right to establish a proration unit is not, however, without its limits. We note that special field rules applicable to this property mandate the allocation of a given amount of acreage in order to obtain an allowable for purposes of production. Because the operator of the Tarbox #1 well cannot lawfully produce from that well without an allowable issued by the Railroad Commission, and because the Wellbore Lease does not encompass sufficient acreage to obtain an allowable in its own right, then the wellbore must be included in a proration unit consisting of the requisite number of acres to allow production. By reserving the right "to produce" from the Tarbox #1 wellbore, we must conclude the parties to the Unit Lease contemplated that sufficient acreage from the Unit Lease would be designated for that purpose. In that regard, we do not presume to speak to any issues regarding the size or configuration of that designated acreage. Nor do we presume to speak to the

---

grantors, such as the Tarboxes, cannot convey to a grantee, such as Pond, greater or better title than they lawfully hold. *Law v. State,* 811 S.W.2d 265, 267 (Tex. App.—Houston [1st Dist.] 1991, no pet.) (citing *Day & Co., Inc. v. Texland Petroleum, Inc.,* 718 S.W.2d 384, 390 (Tex. App.—Amarillo 1986), *aff'd,* 786 S.W.2d 667 (Tex. 1990)). *See Key Operating & Equipment, Inc. v. Hegar,* 403 S.W.3d 318, 326 (Tex. App.—Houston [1st Dist.] 2013, pet. granted, Dec. 13, 2013). The Wellbore Lease was executed *after* the Unit Lease, meaning the Tarboxes could not convey to Pond rights which they did not own when the Wellbore Lease was executed. That the Wellbore Lease was recorded prior to the Unit Lease is of no moment because the leases do not conflict in terms of the mineral rights granted, i.e., Unit's leasehold estate encompasses the entire acreage encapsulating the wellbore, subject to the reservation of the right to produce from the wellbore only, while Pond's leasehold estate encompasses the wellbore only. Because the estates do no conflict, the date of recordation or regulatory permit does not determine the respective rights of the parties. There is no "race to the courthouse" or "race to the Commission."

effect such a designation would have on the Railroad Commission's future issuance of an allowable or the effect of allowables issued in the past, because the assignment of allowables is a matter exclusively within the jurisdiction of the Railroad Commission, not this Court. What is clear to us is that the parties contemplated that a proration unit would be designated. Therefore, because the Tarboxes reserved their right, and that of their assigns and lessees, "to produce" from the Tarbox #1, we conclude Unit's executive right to designate a proration unit encompassing its lease is subject to a duty to designate sufficient acreage to permit the Railroad Commission to issue an allowable for the Tarbox #1.[14]

While we find that Unit has the exclusive executive right to establish a proration unit encompassing any part of its leasehold estate, *see Lesley*, 352 S.W.3d at 486, we find that right to be encumbered with an implied duty owed to the owner of the reserved wellbore to designate a sufficient amount of acreage to permit the Tarboxes, their assignees and lessees, to-wit: Pond, "to produce" oil, gas and other minerals from the Tarbox #1 wellbore. In other words, Unit must designate sufficient acreage to satisfy the minimum proration unit necessary to obtain a Railroad Commission allowable for the

---

[14] Unlike the assignments in *Petro Pro, Ltd.,* which were "completely devoid of language limiting Petro's leasehold interest to the Cleveland formation," *Petro Pro, Ltd.*, 279 S.W.3d at 750-51, and permitted Petro Pro's development of the leased premises for the purpose of "exploring, drilling, mining, operating for and producing oil . . . , *id.* at 751-52, the Tarboxes' reservation in the Unit Lease expressly limits their activities from the existing wellbore to "production only from the Cleveland formation defined . . . as between the depths of 7,930 feet subsurface to 7,990 feet subsurface, in which the wellbore is currently completed." Thus, this specific limiting language in the Tarboxes' reservation also limits Pond's wellbore production to production only from the depths of the Cleveland formation specified therein. *See Law v. State*, 811 S.W.2d 265, 267 (Tex. App.—Houston [1st Dist.] 1991, no pet.).

16

Tarbox #1, thereby permitting Pond to produce from that wellbore.[15]  *See Tarrant Cnty. Water Control & Imp. Dist. No. One*, 854 S.W.2d at 911.

Pond asserts that, when the Railroad Commission approved his P-4, he succeeded to the eighty acre proration unit established in 1984 for Vance Oil and Gas, Inc. and that proration unit may only be altered "at his option."  *See supra* n.6.  In that regard, we believe Pond is mistaken.  It has long been the law in Texas that "[w]here a case involves title and property rights, the legal construction of a lease, and a claim of entitlement to an injunction, the courts have jurisdiction," not the Railroad Commission. *Amarillo Oil Co. v. Energy-Agri Products, Inc.,* 794 S.W.2d 20, 26 (Tex. 1990) (collected cases cited therein).  A permit from the Railroad Commission is a mere "negative pronouncement" that grants no affirmative rights to the permittee to occupy the property. *FPL Farming, Ltd. v. Environmental Processing Systems, L.C.,* 351 S.W.3d 306, 311 (Tex. 2011) (quoting *Berkley v. Railroad Comm'n of Tex*., 282 S.W.3d 240, 243 (Tex. App.—Amarillo 2009, no pet.)).  In fact, it is doubtful whether the Railroad Commission's permits are admissible in title or lease disputes.  *See Magnolia Petroleum Co. v. Railroad Comm'n of Tex.,* 141 Tex. 96, 170 S.W.2d 189, 191 (1943) ("the fact that a [Railroad Commission] permit to drill had been granted would not be admissible in support of permittee's title"); *Duncan Land & Exploration, Inc. v. Littlepage,* 984 S.W.2d 318, 328 (Tex. App.—Fort Worth 1998, pet. denied) ("[T]he existence of the [Railroad Commission's] shut-in order, by itself, d[oes] not affect the lease, or the rights of [lessor and lessee] under the lease.").  Accordingly, Unit's leasehold estate, including its

---

[15] We express no opinion as to the allocation of production from that well pursuant to that allowable.  We would note, however, that a lessee must strictly comply with the pooling provisions, if any, in a lease.  *Browning Oil Co. v. Luecke*, 38 S.W.3d 625, 640 (Tex. App.—Austin 2000, pet. denied).

executive right to develop that entire estate, is not limited by the P-4 filed by Pond and approved by the Railroad Commission.

This is particularly so because Pond's P-4 did not require the submission of, or make reference to, any plat or other indication of acreage allocated to the Tarbox #1 well for production purposes. In his P-4 application, Pond did not inform the Railroad Commission that the prior lease had been terminated, that Unit had been granted a new lease on the property subject to the Tarbox #1 well, or that Pond's mineral interest was limited to the circumference of that well. Instead, Pond's P-4 application indicated it was a mere change of operator only, i.e., that Pond was replacing BP as operator. In filing his P-4, Pond simply adopted the lease name "Tarbox" and lease number "05840," designations which originated with Railroad Commission filings by Vance in 1984 when the operator's mineral interest encompassed the entire 319.8 acres.

Pond also places great emphasis on the description of the wellbore contained in the Tarboxes' reservation in the Unit Lease in asserting it was Unit's and the Tarboxes' intent to permit the Tarboxes, or their assignees and lessees, to set the proration unit for the wellbore, i.e., "the wellbore of the Tabox (sic) *Unit* #1 well located on the leased premises." (Emphasis added.) Pond asserts that, by use of the word "*Unit,*" the parties to Unit's lease intended a reference to Vance's 1984 proration *unit.* Again, we disagree.

The language in a contract is to be given its plain, ordinary, and generally accepted meaning unless doing so would defeat the parties' intent. *Petro Pro, Ltd.,* 279 S.W.3d at 748 n.3. A "unit" is defined as "a single thing . . . that constitutes an undivided whole" or "a piece or complex of apparatus serving to perform one particular

function . . . ." *Webster's Third New International Dictionary* 2500 (4th ed. 1976). Thus, assuming Pond's interpretation that the term "*Unit*" even applies to the scope of the leasehold estate, accepting its construction of that word would be tantamount to inserting the word "proration" into the lease agreement before the term "*Unit*" and writing into the lease a limitation on the rights of the lessee not found in the plain meaning of the parties' language. This we cannot do. *See Fox v. Thoreson,* 398 S.W.2d 88, 92 (Tex. 1966) ("Another sound rule of interpretation is that language used by the parties to an oil and gas lease will not be held to impose a special limitation on the grant unless it is clear and precise and so unequivocal in nature that it can reasonably be given no other meaning.") (citing *Knight v. Chicago Corp.,* 144 Tex. 98, 188 S.W.2d 654, 566 (1945)).

## ESTOPPEL

The trial court concluded that, having accepted the benefits of its lease from the Tarboxes containing the wellbore reservation and reserved right to produce, Unit is estopped from asserting that its lease grants it the right to "amend and revise Pond's proration unit to suit its development plans, ex-post facto." *See Lopez v. Munoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 864 (Tex. 2000) (doctrine of quasi-estoppel applies when it would be unconscionable to allow party to maintain position inconsistent with one from which it had accepted a benefit). At its foundation, the court's conclusion depends on the correctness of its construction of the wellbore reservation. We have expressed our disagreement with the trial court's construction that created an appurtenant contract right in Pond's favor permitting it unilaterally to assign, designate and/or claim an eighty acre proration unit without regard to its necessity. Because we

do not read the lease to give Pond such a right, we cannot agree that Unit has accepted the benefit of a lease containing that right in Pond's favor. It follows that the doctrine of quasi-estoppel cannot bind Unit to Pond's view of its contractual rights.

Accordingly, we sustain Unit's first issue. The remainder of Unit's issues are pretermitted. TEX. R. APP. P. 47.1.

CONCLUSION

We reverse the judgment of the trial court and render judgment declaring that under the Unit lease, Unit has the right to use the surface area of its leasehold estate to the extent that is reasonably necessary to develop and produce the minerals, including the exclusive executive right to establish a proration unit encompassing any of its leasehold estate, subject to an obligation to designate a sufficient amount and configuration of acreage to permit Pond, "to produce" oil, gas and other minerals from the Tarbox #1 wellbore in accordance with applicable regulatory requirements. In other words, Unit must designate a proration unit of sufficient acreage to satisfy the minimum proration unit necessary to meet regulatory requirements to obtain an allowable to produce from that wellbore. As the Tarboxes' lessee, Pond has the right "to produce" from its leasehold estate which includes the right to use the surface area in and around the Tarbox #1 wellbore to the extent that it is reasonably necessary to produce minerals, including the right to have a proration unit established and approved by the Railroad Commission that permits Pond to produce from the Cleveland formation at the depths specified in the Tarboxes' reservation in Unit's lease. As a result, Pond did not acquire title to any oil, gas or other minerals in place outside of the wellbore, or the appurtenant right to establish, designate or claim a proration unit encompassing any

20

property other than the wellbore itself.  We remand this action to the trial court for further proceedings in conformance with this opinion.


Patrick A. Pirtle<br>
Justice